[No. 50028–2.  En Banc.  September 27, 1984.]

THE STATE OF WASHINGTON, *Respondent*, v. RONALD
PRINCE MYERS, SR., *Petitioner*.

*Gary F. Bass*, for petitioner.

*Norm Maleng, Prosecuting Attorney, J. Robin Hunt, Senior Deputy,* and *Deborah J. Phillips, Deputy,* for respondent.

PEARSON, J.—Ronald Myers appeals from a conviction for possession of heroin with intent to manufacture and deliver. Myers contends that King County police officers illegally used a fictitious arrest warrant to gain entry to his house in order to execute a valid search warrant. The Court of Appeals disagreed with Myers and upheld the seizure. *State v. Myers,* 35 Wn. App. 543, 667 P.2d 1142 (1983). We affirm.

I

On October 7, 1981, Seattle District Court Judge Quigley signed a warrant authorizing a search of Myers' home on South Byron Street in Seattle. The warrant directed a search for "controlled substances, including heroin". The investigating officers were aware that there were wrought iron bars across the windows and front door of Myers' home. The front door frame had two doors, approximately 3 inches apart, attached to it. The inside door was a normal wood exterior door; the outer door, however, was made of cast–iron grillwork with openings which were too small to allow entry by any person. The officers had also been told by an informant that Myers usually answered the door, either in possession of a handgun or with a handgun within reach.

For these reasons, the officers decided that unless they

used a "ruse" to get Myers to unlock and open the wrought iron front door, they might be unable to get inside the house and execute the search warrant. The officers therefore prepared a fictitious warrant for Myers' arrest for a traffic offense. The fictitious warrant was on an authentic warrant form, but it was signed by one of the officers in the name of a nonexistent judge. The officers were aware that Myers was not wanted for any traffic violations.

On the afternoon of October 7, 1981, Detectives Lawrence Gross and Earl Tripp went up to Myers' front door. Four or five other officers waited about a block away. When Gross knocked on the front door, Myers opened the inside wooden door, leaving the wrought iron gate closed and locked. The detectives identified themselves as police officers and told Myers that they had a traffic warrant for his arrest. They showed Myers the fictitious arrest warrant. Myers indicated that he thought there was a mistake being made and that he was not the subject of an arrest warrant. The officers then asked if they could enter the house and make a phone call to clear things up. Myers opened the outside iron gate and invited the officers in. As soon as the gate was open, and before the officers entered the house, Detective Tripp advised Myers that he had a search warrant. Myers then told the officers to come inside; that he had nothing to hide. The detectives then entered, along with the waiting officers who had been signaled by Tripp. No force was used to enter. The subsequent search produced heroin, drug paraphernalia, and a large amount of cash. Myers was then arrested.

Myers described the incident somewhat differently. According to him, the officers forced their way in at gunpoint as soon as he opened the iron gate. He claimed that the only reason he opened the gate was that he thought he had no choice in view of the arrest warrant. Myers also said that he was not told the officers' true purpose until 45 to 50 minutes after they entered his home.

The trial court believed the officers' testimony and upheld the seizure of the items from Myers' home. The

court then found Myers guilty, on stipulated facts, of possessing heroin with intent to manufacture and deliver.

The Court of Appeals affirmed Myers' conviction on appeal, stating that his due process rights were not violated because the police conduct was not shocking to the universal sense of justice.

## II

Myers argues in his petition that the police officers' use of the fictitious arrest warrant violated his due process rights. Myers asserts that his conviction should be barred either on due process grounds or in the exercise of this court's inherent supervisory powers.

## A

Law enforcement conduct does not violate due process unless it is "so shocking as to violate fundamental fairness." *State v. Smith,* 93 Wn.2d 329, 351, 610 P.2d 869, *cert. denied,* 449 U.S. 873 (1980). *See also United States v. Russell,* 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637 (1973); *State v. Emerson,* 10 Wn. App. 235, 517 P.2d 245 (1973). The mere fact of deceit will not defeat a prosecution, "for there are circumstances when the use of deceit is the only practicable law enforcement technique available." *Russell,* 411 U.S. at 436. It appears that the broad "fundamental fairness" guaranty is not transgressed absent "coercion, violence or brutality to the person". *See Irvine v. California,* 347 U.S. 128, 132, 133, 98 L. Ed. 561, 74 S. Ct. 381 (1954) (distinguishing *Rochin v. California,* 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205, 25 A.L.R.2d 1396 (1952)). *See also United States v. Kelly,* 707 F.2d 1460 (D.C. Cir. 1983), and cases cited therein. "The requisite level of outrageousness . . . is not established merely upon a showing of obnoxious behavior or even flagrant misconduct on the part of the police . . ." *Kelly,* at 1476.

In order to invoke the limitations of due process, it must be shown that the government activity involved violates a specific constitutional right of the defendant. *Hampton v. United States,* 425 U.S. 484, 490–91, 48 L. Ed.

2d 113, 96 S. Ct. 1646 (1976). Thus, we must determine whether Myers' rights under either the Fourth Amendment or Const. art. 1, § 7 were violated in this case.

## B

The Fourth Amendment requires "an announcement by police officers of purpose and authority before breaking into an individual's home." *Ker v. California,* 374 U.S. 23, 49, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963). (This "knock and announce" requirement has been codified in Washington as RCW 10.31.040.) The knock and announce rule "is applicable not only when force is used to obtain entry, but whenever police enter without valid permission." *State v. Coyle,* 95 Wn.2d 1, 5, 621 P.2d 1256 (1980). *Accord, State v. Miller,* 7 Wn. App. 414, 418–19, 499 P.2d 241 (1972); *see also Sabbath v. United States,* 391 U.S. 585, 20 L. Ed. 2d 828, 88 S. Ct. 1755 (1968).

The knock and announce requirement was complied with in this case. The trial court found that Myers was informed of the officers' actual purpose *before* the officers entered the house. Myers then invited the officers inside. Thus, unless the initial subterfuge which convinced Myers to open the outside iron gate somehow tainted the subsequent events, the officers fully complied with the constitutional and statutory "knock and announce" requirements.

In determining whether the initial subterfuge employed by the officers to persuade Myers to open his gate somehow tainted subsequent events, we are faced with a question of first impression for this court: whether police may constitutionally employ a "ruse" to gain entry in order to conduct an authorized search. An announcement by the police of their purpose and authority is of little use to a defendant if the announcing officer has his foot in a door which has been unconstitutionally opened.

██ The general rule is that entry by ruse is permissible if no force is used. *See State v. Ellis,* 21 Wn. App. 123, 584 P.2d 428 (1978). *See also* Annot., *What Constitutes Compliance With Knock–and–Announce Rule in Search of*

*Private Premises—State Cases,* 70 A.L.R.3d 217 (1976), §
10.5, at 12 (Supp. 1983) (state cases); Annot., *What Con-*
*stitutes Violation of 18 USCS § 3109 Requiring Federal*
*Officer To Give Notice of His Authority and Purpose Prior*
*to Breaking Open Door or Window or Other Part of House*
*To Execute Search Warrant,* 21 A.L.R. Fed. 820, §§ 11, 13
(1974) (federal cases). Although the United States Supreme
Court has not yet clearly spoken on the issue, language in
some of its cases tends to support the majority rule. In
*Lewis v. United States,* 385 U.S. 206, 17 L. Ed. 2d 312, 87
S. Ct. 424 (1966), for example, an undercover officer tele-
phoned the suspect and misrepresented his identity in
order to gain an invitation to the suspect's home. The ruse
worked, and the officer twice purchased marijuana from the
suspect at his home. The marijuana thus purchased was
then admitted against the suspect at trial. The Supreme
Court found no constitutional violation. Although *Lewis*
did not involve a search or seizure and is on that basis dis-
tinguishable, the Court said that the undercover agent was
validly "invited" into the suspect's home. *Lewis,* at 211.
Also, the Court in *Lewis* seemed to approve of "covert
dealings" and "the use of decoys" in narcotics cases. *Lewis,*
at 210 & n.6. *See also Dalia v. United States,* 441 U.S. 238,
253 n.14, 60 L. Ed. 2d 177, 99 S. Ct. 1682 (1979). The Court
noted in *Sabbath v. United States, supra,* in dicta, that
"entries obtained by ruse . . . have been viewed as involv-
ing no 'breaking.'" 391 U.S. at 590 n.7.

Washington courts have been more specific. In *State v.*
*Huckaby,* 15 Wn. App. 280, 549 P.2d 35 (1976), the court
stated:

> The use of deception to gain entry to a premises, as
> long as no force is involved, has long been considered
> proper police practice, and in such cases law enforcement
> officers need not announce their identity, authority, and
> purpose under the "knock and announce" rule.

*Huckaby,* at 285. Thus, "the ruse will be permitted but
only if successful." *Ellis,* 21 Wn. App. at 125. *See also*
*State v. Hartnell,* 15 Wn. App. 410, 550 P.2d 63 (1976).

The guiding factor in determining whether a ruse entry, to execute a search warrant, constitutes a "breaking" under the Fourth Amendment should be whether the tactic frustrates the purposes of the "knock and announce" rule. Those purposes are: (1) reduction of potential violence to both occupants and police resulting from an unannounced entry, (2) prevention of unnecessary property damage, and (3) protection of an occupant's right to privacy. *State v. Coyle, supra* at 5.

It appears obvious that a ruse entry, especially when the deception is not realized until after the entry has been accomplished, actually promotes both the purpose of preventing violent confrontation between the officer and a surprised occupant and that of preventing unnecessary property damage. Ruse entries such as that in the present case lack the element of surprise, thereby reducing the chance of confrontation. In the event that exigent circumstances would allow an unannounced forcible entry, a ruse entry could avoid the destruction of a door, or other violence.

Whether a ruse entry is truly an affront to an individual's right of privacy in his home, however, is not so obvious. The key factor in determining whether the "knock and announce" requirement applies in a case is not whether the entry was a "forcible" one, but whether the entry was pursuant to the "valid permission" of the occupant. *Coyle,* at 5. *See also Sabbath v. United States, supra.* The argument has been made that an entry obtained by police through fraudulent misrepresentation of their identity or purpose is not truly permissive because of the deceit used to obtain the occupant's consent to enter. The cornerstone of this argument is that the occupant has the initial right to voluntarily surrender his privacy, even though he has no right to deny the authorized entry. It has thus been posited that any entry obtained other than by the informed consent of the occupant is a "breaking", because it is not made with the occupant's "valid permission".

This argument is not persuasive. The occupant's right of

privacy is severely limited where the police have satisfied the Fourth Amendment's probable cause and warrant requirements. In such a case, the officers possess the authority to intrude upon the privacy of the home regardless of the occupant's wishes and irrespective of his activity at the time of the intrusion. It is difficult to see how imposition of an informed consent standard at entry would meaningfully promote any concept of privacy. Ruse entries are invariably characterized by some degree of advance notice; the occupant is expecting an entry. The entry is consensual, if the ruse works. *See State v. Ellis, supra; State v. Hartnell, supra.*

Moreover, courts have held that an occupant waives his right to privacy upon his initial consent to allow a police officer to enter, even though the occupant is unaware of the officer's identity. *See Hartnell,* 15 Wn. App. at 417; *Huckaby,* 15 Wn. App. at 290. The *Huckaby* court expressed concern that imposing an informed consent requirement on all police entries would come near to a rule declaring all undercover police activity unconstitutional per se. *Huckaby,* at 290.

In short, it seems that since an occupant cannot deny entry to police in possession of a search warrant, he loses nothing in terms of privacy when the officers fail to state their actual authority and purpose, but rather obtain permission to enter by means of a trick or ruse. The underlying purpose of protecting the privacy of the home is not threatened by ruse entries. Thus, the mere fact that a ruse has been used does not violate a defendant's right to be free from unreasonable search and seizure.

## C

Myers also contends that the police conduct in this case violated the separation of powers doctrine. He argues that the fake arrest warrant was used to force him to do something he could not otherwise have been compelled to do, thereby usurping the judicial role. This argument is without merit, however, as the police derived their authority to act

solely from the valid search warrant. The entry and search of Myers' home, and the temporary detention of Myers were authorized by the search warrant. *Michigan v. Summers*, 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981) (search warrant grants limited authority to detain occupants of premises until a proper search is conducted). *Accord, State v. Galloway*, 14 Wn. App. 200, 540 P.2d 444 (1975). The false arrest warrant was not relied on, except as a ruse.

### D

■ Myers further contends that the officers, in filling out the unauthorized arrest warrant, violated several state statutes, thus depriving him of due process. It is well established, however, that violations of state law by law enforcement officers do not, without more, deprive a defendant of due process. *Cooks v. Spalding*, 660 F.2d 738 (9th Cir. 1981), *cert. denied*, 455 U.S. 1026 (1982). *See, e.g., State v. Clark*, 34 Wn. App. 173, 659 P.2d 554 (1983) (fundamental fairness not violated where police deputy accepted sexual services for a fee pursuant to a prostitution ring investigation); *State v. Jessup*, 31 Wn. App. 304, 641 P.2d 1185 (1982) (use of undercover agent who engaged in prostitution and helped to recruit prostitutes did not violate due process); *State v. Brooks*, 30 Wn. App. 280, 633 P.2d 1345 (1981) (police participation in a business to fence stolen property did not violate due process). While the use of a bogus arrest warrant by the police is certainly offensive from a public policy standpoint, the officers' "use" of the false warrant in this particular case was too minimal to constitute conduct that is fundamentally unfair.

### E

■ Finally, Myers urges us to invoke our supervisory powers to exclude the evidence against him. We have recently stated that

> the exclusionary rule should be applied to achieve three objectives: first, and most important, to protect privacy interests of individuals against unreasonable governmen-

tal intrusions; second, to deter the police from acting *unlawfully* in obtaining evidence; and third, to preserve the dignity of the judiciary by refusing to consider evidence which has been obtained through *illegal* means.

(Italics ours.) *State v. Bonds,* 98 Wn.2d 1, 12, 653 P.2d 1024 (1982).

Myers' right to be free from unreasonable search and seizure was not violated here; thus, application of the exclusionary rule in this case would not advance the primary purpose behind the rule.

Myers argues, however, that the officers, in filling out the unauthorized arrest warrant, committed several crimes, including forgery (RCW 9A.60.020) and criminal impersonation (RCW 9A.60.040). This would implicate the second and third purposes underlying the exclusionary rule. We are not convinced, however, that the officers possessed the requisite intent to injure or defraud for these crimes. Myers' other allegations are also without merit. The entry into Myers' house was entirely lawful. We therefore decline Myers' invitation to invoke the exclusionary rule in this case.

Our refusal to apply the exclusionary rule in this case should in no way be read to condone the use of a bogus judicial warrant. It is disturbing that the officers in this case would pay so little heed to the neutral and detached position of the magistrate. Moreover, public policy considerations weigh heavily against the unauthorized use of a document which has heretofore demanded unquestioning obedience. Repeated use of fictitious warrants invites disobedience and confrontation. Such a practice can only be condemned.[1]

The Court of Appeals is affirmed.

WILLIAMS, C.J., UTTER, BRACHTENBACH, DOLLIVER, and DORE, JJ., and CUNNINGHAM, J. Pro Tem., concur.

---

[1]For a far more creative and acceptable solution to the problem faced by the police in this case, namely, gaining entrance to a virtual fortress, *see People v. Thompson,* 89 Cal. App. 3d 425, 152 Cal. Rptr. 495 (1979).

ROSELLINI, J. (concurring in the result)—I agree with the majority. The falsification of judicial warrants by police officers to obtain peaceful entry into defendant's home did not violate his due process rights. I also agree that we, as a court, cannot condone such activity on the part of law enforcement officers. These individuals are sworn to uphold and enforce the law; not to bend or break it to effectuate even desirable ends. Because I believe that this court must today forbid improper use of judicial documents, I concur only in the majority's result.

In falsifying an arrest warrant, the police engaged in activity which, if not illegal, came dangerously close to illegality. For instance, their activity seems to be prohibited by the forgery statute, RCW 9A.60.020. That statute makes it a crime to deceive someone with a written instrument that is not authentic because the ostensible maker is fictitious.

Here, a police officer signed the name of a fictitious judge as authorization for the bogus arrest warrant. Thus, the police conduct fits squarely within the terms of subsection (1) of the statute. Nonetheless, the majority asserts that the police officers did not intend to commit a crime.

While this may be technically true, the police activity clearly violates general notions of fair play and justice. Moreover, such actions on the part of law enforcement officers must inevitably result in an erosion of public confidence in the warrant system and the judiciary by denigrating its integrity.

The importance of this integrity has been a frequent subject of the United States Supreme Court. For example, Justice Clark has written:

> There are those who say, as did Justice (then Judge) Cardozo, that under our constitutional exclusionary doctrine "[t]he criminal is to go free because the constable has blundered." *People* v. *Defore,* 242 N. Y., at 21, 150 N. E., at 587. In some cases this will undoubtedly be the result. But, as was said in *Elkins* [*v. United States,* 364 U.S. 206 (1960)], "there is another consideration—the imperative of judicial integrity." 364 U. S., at 222. The criminal goes free, if he must, but it is the law that sets

him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence. As Mr. Justice Brandeis, dissenting, said in *Olmstead* v. *United States,* 277 U. S. 438, 485 (1928): "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. . . . If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy."

(Footnote omitted.) *Mapp v. Ohio,* 367 U.S. 643, 659, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R.2d 933 (1961).

Furthermore, while history has taught us the general need for public confidence in our judicial system, the warrant requirement, in particular, depends upon voluntary compliance and public belief in a warrant's authenticity. Suspects willingly open the doors when they are certain that the police have probable cause to arrest them. Without that belief in the warrant's authenticity, the suspect will, in future cases, resist execution of arrest and search warrants in the belief that they are acting within their rights. Contrary to Justice Dimmick's assertions, this must eventually result in more, not less, police/suspect confrontations.

To avoid additional confrontation and to preserve public respect for the warrant system, I would take the same approach in this case as we did in *State v. Bonds,* 98 Wn.2d 1, 653 P.2d 1024 (1982). There, we recognized the illegality of the police activity and put law enforcement officials on notice that repeated impropriety would result in exclusion in the next case. Where police officers falsify a judicial document, I would do no less.

DIMMICK, J. (concurring in the result)—I concur in the result but respectfully object to dicta in the majority opinion disapproving the police officers' use of a fictitious arrest warrant to gain entry to a house in order to execute a valid search warrant. The majority recognizes that ruse entries reduce the likelihood of violent confrontations or unnecessary destruction of property. Nevertheless, the majority

condemns this police action without providing any guidance to law enforcement officials.

The police action, as the majority holds, did not deny the defendant due process. In *United States v. Gjieli,* 717 F.2d 968 (6th Cir. 1983), *cert. denied,* 104 S. Ct. 1595 (1984), the court found no due process violation where, pursuant to a bribery investigation, the Assistant United States Attorney obtained a bogus writ of habeas corpus by presenting a false request to a federal district court judge. The appellate court refused to exercise its supervisory powers to reverse the defendant's conviction, despite the government attorney's fraud on the court. In contrast to the offensive behavior of the government attorney in *Gjieli,* the police officers here worked no fraud on the court but rather, devised a successful ruse which harmed no one.

The execution of search warrants requires a case–by–case evaluation of tactics which may reduce violence and prevent destruction of property. Tying the hands of the police in cases such as this, as the majority attempts to do by condemning the use of fictitious arrest warrants, may well lead to the use of procedures which are clearly permissible but far more dangerous. Unable to effect a peaceful entry by use of a harmless ruse, the police, out of a justified concern for their safety, may approach the area to be searched massively armed, with weapons drawn. Or, to avoid a violent confrontation, the police may be forced to destroy the building's entrance in an effort to execute a search warrant. These tactics have a far greater potential for tragic results than the ruse condemned by the majority. I believe the determination of appropriate methods by which to execute search warrants is a policy decision best left to the discretion and expertise of the police department.