[No. 22428–0–I. Division One. June 25, 1990.]

THE STATE OF WASHINGTON, *Respondent*, v. BARRY
JAY SMITS, *Appellant.*

*Jeffrey A. Thigpen* and *Herships & Tario*, for appellant.

*David S. McEachran, Prosecuting Attorney,* and *Ronald C. Hardesty, Special Deputy,* for respondent.

GROSSE, A.C.J.—Barry Jay Smits (Smits) appeals his conviction for the assault of a police officer. His contentions are two–fold: (1) the trial court erred in disallowing cross examination of the police officer as to his potential financial interest from a (possible) civil suit against Smits, and (2) instructional error in that the trial court erred in instructing the jury with regard to the necessity of a person producing a driver's license when asked by a police officer. We reverse.

There are two distinct versions of what happened the night of the incident: (1) that of Smits and those riding in his car, and (2) that of the police officer(s). Where important, the distinctions will be pointed out.

The Ferndale Police Department received a call from an employee of the local Dairy Queen. She reported she had encountered several obnoxious persons in a car at the drive–in window. She believed some of the occupants to be intoxicated. The occupants of the car (Barry Smits, who was driving; his wife; their baby; and two friends) were unhappy with the service at the drive–in. According to the employee's testimony, the occupants of the car were loud, obnoxious, and used vulgar language and obscene gestures. Dispatch contacted Officer Wenzl of the Ferndale Police Department and gave him the license number and description of the car as reported by the restaurant employee. Officer Wenzl found the car at another drive–in. When Smits pulled out from this restaurant, Officer Wenzl followed his vehicle as it went through downtown Ferndale. Both cars entered the freeway and headed north. The officer testified that he followed the Smits vehicle at a close distance to attempt to determine if the driver was driving impaired. Smits and his passengers testified that the officer's vehicle had its bright lights on and was following from 1– to 2–car lengths behind. Officer Wenzl testified he did not have on his bright lights and was traveling 1½ seconds behind Smits on the freeway (timed using an inanimate object along side of the road as a marker), a distance he believed to be safe. The officer testified that Smits was driving well.

Smits pulled off on an exit and Officer Wenzl followed. Officer Wenzl testified he was not going to pull Smits over because he had no reason to stop him. Smits, his wife, and one of the passengers testified that when Smits stopped at the stop sign at the end of the exit, although upset with a drunk passenger, the delay at the Dairy Queen, and the fact the car behind them was following too close, he pulled to the side of the exit, calmly exited his vehicle, and

approached the other car which had followed him off the freeway. Smits testified that until he exited his car, he did not realize the other car was a police car. Here the testimony takes remarkably divergent routes. Officer Wenzl testified that Smits came storming back to his vehicle and was acting like a wild man. In order for the officer to exit his vehicle he had to push his door into Smits to get him to move. The officer testified that at this point he asked for Smits' driver's license. He stated that Smits refused to show his license, called him names, used threatening language, and then stormed back to his car. Wenzl testified that he followed Smits, again asked for his license, and told Smits it would not be a good idea for him to leave as Smits was indicating he was about to do. Wenzl testified that as Smits drove away, he got back in his patrol car and called dispatch. He stated he told dispatch about the incident and Smits' wild behavior and attitude. The tape of this and other radio calls was played at trial.

Officer Wenzl pursued the Smits vehicle, this time with his emergency lights activated. Smits found a safe place in a parking lot to pull over. At this second stop, Officer Wenzl testified he told Smits that he was under arrest, a fact with which Smits disagrees. Smits started to resist the officer so Wenzl grabbed hold of him and spun him around by the shoulders to place him up against the police car. At this time, Mrs. Smits got into the fray. She approached Officer Wenzl with her 3–month–old child in her arms. Wenzl testified that she pushed him and he told her to stop but, in fact, he did push her away. She gave the baby to one of the passengers and returned to the ruckus. Here, according to Officer Wenzl, Smits threatened him not to harm his wife or his baby or he would kill him. Wenzl pushed Mrs. Smits again after she began to hit him and immediately thereafter Smits punched Wenzl in the face once and then twice more. Wenzl returned to the safety of his vehicle and waited for a backup officer to arrive. The officer claims that Smits was right outside his driver's window screaming at him when the backup arrived.

After the second police car arrived Smits was taken into custody and was taken to the Ferndale Police Station. After several breath tests, it was determined that Smits had a zero percentage alcohol content reading. He was charged with second degree assault.

Smits' version varies significantly. Smits claims that when he stopped the first time, Officer Wenzl never asked him for his license. Although he was upset with the other driver for tailgating and using his bright lights, along with the other circumstances of the evening, he said he calmly approached the officer. He claims the officer slammed the door of the police car into him as he approached. Smits claims the officer never told him he would be arrested if he left the scene, although he did admit that the officer said it would not be a good idea for him to leave. Smits testified that Officer Wenzl grabbed him by the lapels of his coat trying to stop him from leaving. At the second stop, Smits claimed Wenzl's actions were threatening to his wife and child. The Smits testified that Mrs. Smits was pushed and knocked to the ground when she tried to intervene the second time. Smits said he hit Wenzl to protect and come to the defense of his family, mainly his wife.

The second degree assault charge was reduced to third degree assault before trial. At trial the defense attorney was precluded from examining Officer Wenzl about any financial interest he might have in the result of the trial. Smits was convicted of third degree assault by the jury. Although not included in the record, it is assumed that a judgment and sentence was entered upon the verdict.

Smits claims he should have been permitted to examine Officer Wenzl as to whether or not he had a financial interest in the outcome of the proceedings in which he was testifying as the State's chief witness. Smits contends the court's limitation of his cross examination of Wenzl denied him his constitutional right to confront the witness against him and precluded him from showing Wenzl's bias against him.

 A trial court's ruling as to the scope of an examination will not be disturbed absent a manifest abuse of discretion by the trial court. *State v. Mak,* 105 Wn.2d 692, 710, 718 P.2d 407, *cert. denied,* 479 U.S. 995 (1986). However, the cases on which Smits relies state that a *total* denial of cross examination regarding the existence of civil claims that the witness may have against a defendant is an abuse of discretion. *Villaroman v. United States,* 184 F.2d 261, 262 (D.C. Cir. 1950); *State v. Whyde,* 30 Wn. App. 162, 632 P.2d 913 (1981).

In this case, no civil claim had been filed at the time of trial, although suit has since been filed by Wenzl against Smits. In *State v. Whyde, supra,* and the cases cited therein, civil actions had already been filed, or threatened. However, "[w]hether the victim intends to commence a civil action for money damages is a proper subject for impeachment." *Whyde,* at 166 (citing *Villaroman,* 184 F.2d at 261). *See also Sullivan v. United States,* 404 A.2d 153 (D.C. 1979) in which the rationale was extended to admit evidence of contemplated, as well as pending, civil actions. "[A] contemplated suit, like a pending one, is relevant to a jury's gauging the degree to which discrediting factors of bias—*e.g.,* ill-will and pecuniary interest—act to impeach the complainant's testimony." (Footnote omitted.) *Sullivan v. United States,* 404 A.2d at 160–61.

> While trial courts have discretion in limiting the scope of cross–examination, Meisenholder states the rule to be:
>> Cross–examination of a witness for the purpose of showing bias, prejudice or interest is a matter of right, but the scope or extent of such cross–examination is a matter in the sound discretion of the court.
> 5 R. Meisenholder, Wash. Prac. § 299, at 264 (1965).

*Whyde,* at 166–67; *see also* 5A K. Tegland, Wash. Prac., *Evidence* § 225 (3d ed. 1989). In this case, although it is true that no action had yet been commenced at the time of

trial, preclusion of any inquiry into possible suit or financial interest was error.[1] The question then becomes whether the error is harmless.

In *Sullivan,* the court concluded the trial court erred in precluding inquiry as to a suit that was merely "contemplated." However, the trial court did not prohibit defense counsel from cross–examining the witness on the details of the accident or the scope of the injuries. The appellate court held that it was the incident that generated the ill–will and the exploration of the bias created by the incident was pursued on cross examination. Further, because the record revealed no indication the witness was contemplating civil action, the court's limitation deprived the jury of very little in the way of impeachment value. *See Sullivan v. United States, supra* at 161; *see also Alford v. United States,* 282 U.S. 687, 694, 75 L. Ed. 624, 51 S. Ct. 218 (1931). In *Sullivan,* because the trial court permitted some examination so the jury had sufficient information from which to infer bias, the court found the error harmless applying the constitutional harmless error test of *Chapman v. California,* 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967).

Under Washington case law, specifically the *Whyde* case which cites to *Davis v. Alaska,* 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974), it has been held that "[t]o call these errors harmless would inevitably presume the truth of [the witness's] testimony and thereby beg the question." *Whyde,* at 167. Thus, in the case here, where the trial court precluded Smits from any inquiry as to the possibility of a civil action, we cannot say the error was harmless. As in *Whyde,* we do not reach the issue of whether denial of cross examination on this subject implicates Sixth Amendment rights.

---

[1]Questions regarding a complainant's civil suit are relevant to a showing of his pecuniary interest in the outcome of the criminal case and/or his ill–will toward the defendant—both recognized manifestations of a witness's bias. 2 C. Torcia, *Wharton on Criminal Evidence* §§ 435–36 (13th ed. 1972).

Smits next claims the trial court erred in instructing the jury that it is unlawful to refuse to produce a driver's license when requested to do so by a police officer.

Jury instruction 6 stated the following:

> Under the laws of the State of Washington, it is unlawful for any person, while operating or in charge of a vehicle, to refuse to produce his driver's license when requested by a police officer.

RCW 46.20.190 states as follows:

> Every licensee shall have his driver's license in his immediate possession at all times when operating a motor vehicle and shall display the same upon demand to any police officer or to any other person *when and if required by law to do so.*

(Italics ours.) Former RCW 46.61.020[2] provided:

> It shall be unlawful for any person while operating or in charge of any vehicle to refuse when requested by a police officer to give his name and address . . . or to refuse upon demand of such police officer to produce his certificate of license registration of such vehicle or his vehicle driver's license or to refuse to permit such officer to take any such license or certificate for the purpose of examination thereof . . ..

Smits claims that the phrase "when and if required by law to do so" in RCW 46.20.190 is critical to the case. He contends the arrest was unlawful, that his wife was therefore privileged to interfere with the officer, and that it was necessary for him to come to the defense of his wife and child. In short, his defense is that although he did hit the officer, he was justified in doing so. He claims that instruction 6 presumes a lawful arrest at the scene of the second encounter. For his contention that the arrest was not lawful, Smits relies on an opinion of the Attorney General from 1959, AGO 88 (1959). This opinion concludes that police officers do not have statutory authority to stop motorists solely for the purpose of examining their driver's licenses, except in such cases as they are otherwise entitled to do by law.

█ Under the rationale of the holding in *Seattle v. Mesiani*, 110 Wn.2d 454, 755 P.2d 775 (1988), AGO 88

---

[2]Former RCW 46.61.020 was amended effective January 1, 1990. Laws of 1989, ch. 353, § 6.

(1959) is still valid and correct. The authority to request an individual's driver's license comes from the cause of the stop not the unconstrained and unfettered discretion of the police. *See State v. Marchand,* 104 Wn.2d 434, 706 P.2d 225 (1985); *Delaware v. Prouse,* 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979). Here, Officer Wenzl did not wave Smits over or make a random stop. It was after Smits voluntarily stopped and came back to the officer that Wenzl asked to see Smits' license. However, the police officer, by his own testimony, had no probable cause or right to ask for Smits' license at that point. Therefore, Smits' refusal to produce it was not a violation of the statute. Because the second stop that led to the confrontation was justified by the officer on the basis of Smits' refusal to produce the license at the first stop and by his wild behavior, it is up to the jury to decide if the stop was reasonable. However, the challenged instruction in question had the effect of wrongfully informing the jury that Smits had broken the law and that the second stop was lawful. Under these circumstances and given the facts of the case, the challenged instruction was not an accurate statement of the law and was improper.

Smits' argument that he and/or his wife were justified in using force in the event of an unlawful arrest was all but rejected in *State v. Holeman,* 103 Wn.2d 426, 429–30, 693 P.2d 89 (1985). There, the court determined that *absent a threat of serious bodily injury to the arrestee,* a person is prohibited from interfering with an arrest made by a uniformed police officer. The court cited and adopted the rationale of *State v. Westlund,* 13 Wn. App. 460, 467, 536 P.2d 20, 77 A.L.R.3d 270 (1975) (arrest was lawful). While *State v. Holeman, supra,* has all but eradicated the right to resist an unlawful arrest, there is evidence in this case sufficient to entitle Smits to proper instructions on the issues of the threat of serious bodily injury to him or to his wife and baby as justifying his assault on the officer. In short, if the arrest was unlawful, Mrs. Smits may have been justified in coming to the aid of her husband if she reasonably believed him to be in danger of serious bodily injury.

In turn, Smits may have been justified in defending his wife if the first condition is true and the force he used was not unreasonable under the circumstances. Although under the rationale of *Holeman* and under the facts in the record we have doubts as to the ultimate success of this defense theory, Smits is entitled to have the jury consider it.

We reverse and remand for retrial.

PEKELIS and WINSOR, JJ., concur.