[No. 12628-5-III.   Division Three.   September 1, 1994.]

THE STATE OF WASHINGTON, *Respondent,* v. RONALD
FLOYD VALENTINE, *Appellant.*

*Brian O'Brien* and *Dorn & O'Brien, P.S.,* for appellant.

*Donald C. Brockett, Prosecuting Attorney,* and *Neil H. Korbas, Deputy,* for respondent.

SWEENEY, A.C.J. — Ronald F. valentine appeals his conviction on one count of third degree assault. He contends two jury instructions relieved the State of the burden of proving every element of the crime beyond a reasonable doubt and amounted to comments on factual issues. We affirm.

## I

### FACTS

On May 16, 1990, at 1 p.m., Officer Richard Robinson called Officer John Moore at the Crime Prevention Center in

downtown Spokane. Officer Robinson had noticed a suspicious-looking[1] person wearing a black coat on a downtown street corner and asked Officer Moore to see if he knew the man. Officer Moore drove to the site and saw a man (Mr. Valentine) with a black coat get into a car and drive away. The officer followed.

When the car turned right without signaling, Officer Moore radioed Officer Robinson that he was going to stop the car for failure to signal. Officer Moore was driving an unmarked car. Although he turned on his dash-mounted blue light and beeped his horn, Mr. Valentine did not pull over for four blocks.

After he had followed the car for about a block, Officer Moore recognized it as Mr. Valentine's. Officer Moore had issued him two notices of infraction for failure to have a front license plate, one 4 days earlier and another a month earlier. Each of these notices had been signed willingly on those occasions, although Officer Moore testified Mr. Valentine had been "less than cooperative".

The officer broadcast on the police radio he thought he was following Mr. Valentine and the car was not stopping. After Mr. Valentine pulled over, Officer Moore parked behind Mr. Valentine's car, Officer Robinson pulled in behind Officer Moore, and a third police vehicle, containing Officer Jay Jones, arrived and parked in a lot nearby.

Officer Moore, carrying a note pad and his portable radio, approached Mr. Valentine and asked for his driver's license. The officer later testified he usually took notes when he questioned a driver and then went back to his car to write the infraction notice in his ticket book. Officer Robinson walked to the right side of the car and began questioning the two passengers.[2]

At first, Mr. Valentine refused to give Officer Moore his driver's license and complained he was being harassed

---

[1] The grounds for the suspicion are not included in this record nor could counsel for the State shed any light on the question.

[2] Officer Robinson later testified he did not believe Mr. Valentine was the suspicious-looking person he had asked Officer Moore to identify.

because he was black. On the third request, Mr. Valentine got out of his car and handed the officer his driver's license and car registration. Officer Moore remembered from the previous stop that Mr. Valentine's address on the license was not current and asked for his new address. Mr. Valentine cursed and told the officer to look it up. Officer Moore testified that when he asked Mr. Valentine if he was going to cooperate and sign the notice of infraction, the answer was an emphatic "no". Officer Jones testified he heard Mr. Valentine say "I am cooperating", and "I even have the front plate on the car". At this point, Mr. Valentine walked to the front of the car. Another police car, containing Detective Robert Webb, arrived.

Officer Moore told Mr. Valentine he was under arrest for failure to cooperate and for failure to sign a notice of infraction. He also told Mr. Valentine his car would be towed. In response, Mr. Valentine walked back to his car door, opened it and reached inside. He testified he told Officer Moore he was going to lock his car since it was going to be impounded. Both Officer Robinson and Officer Jones saw Mr. Valentine push the button to roll up his window. Thinking Mr. Valentine was trying to get into the car, Officers Moore and Robinson each grabbed one of his arms and pulled. Mr. Valentine testified he heard Officer Moore say "Let's get him now".

Mr. Valentine spun around and punched Officers Moore and Robinson in their faces.[3] Officer Moore, who was injured, retreated, and Officer Jones and Detective Webb then entered the scuffle. A fifth officer, Sergeant Michael Yates, arrived and joined in. Sergeant Yates was investigating the scene because he had argued with Mr. Valentine the day before at a tavern.[4] As Sergeant Yates entered the melee, he felt Mr. Valentine tug on his gun holster. Although he guessed the movement might have been inadvertent, the sergeant

---

[3]Mr. Valentine claimed at trial he did not remember hitting Officer Robinson and only hit Officer Moore after the officer "rushed him" and hit him first.

[4]Sergeant Yates testified he and other officers, maybe including Officer Moore, had probably discussed the previous day's argument during roll call 2 hours earlier.

decided to get the situation under control. While Detective Webb tried to twist Mr. Valentine's arm behind his back, Sergeant Yates applied a "carotid hold" to Mr. Valentine's neck. Soon Mr. Valentine slumped to the ground. He was cuffed and taken to jail, where the jail nurse supervisor refused to admit him because of his injuries. After 4 hours of treatment at a hospital emergency room, Mr. Valentine received and signed a notice of infraction and was booked into jail.

He was charged with two counts of third degree assault against Officers Moore and Robinson. In his defense, Mr. Valentine denied he threw the first punch and insisted he used reasonable force to protect himself from an illegal arrest constituting police assault. On March 6, 1992, the jury returned a verdict of guilty to count 1 involving Officer Moore and a verdict of not guilty to count 2 involving Officer Robinson. Mr. Valentine, who had no prior criminal history, was sentenced to 60 days within a standard range of 1 to 3 months. This appeal followed.

## II

### DISCUSSION

Mr. Valentine's assignments of error are limited to challenges to the jury instructions included and excluded by the court.

Mr. Valentine first contends jury instruction 17, defining reasonable resistance to unlawful arrest, contains a provision unsupported by the evidence and shifts the State's burden of proof on an essential element of the case. Instruction 17 provides:

> A person unlawfully arrested by an officer may resist the arrest; the means used to resist an unlawful arrest must be reasonable and proportioned to the injury attempted upon the party sought to be arrested. *The use of force to prevent an unlawful arrest which threatens only a loss of freedom, if you so find, is not reasonable.*

(Italics ours.) Mr. Valentine disputes only the italicized sentence above.

■ ■ Jury instructions must not be misleading, must permit a party to argue his or her theory of the case and, when read as a whole, must properly inform the trier of fact on the law. *State v. Dana*, 73 Wn.2d 533, 536-37, 439 P.2d 403 (1968); *State v. Gibson*, 32 Wn. App. 217, 222, 646 P.2d 786, *review denied*, 97 Wn.2d 1040 (1982). "An instruction on any issue or theory which is unsupported by the evidence is improper." *Gibson*, at 223.

■ It is prejudicial error to submit a theory to the jury in the absence of evidence to support the theory. *State v. Hughes*, 106 Wn.2d 176, 191, 721 P.2d 902 (1986). Substantial evidence is evidence sufficient to convince a fair-minded person of the truth of the declared premise. *Caruso v. Local 690, Int'l Bhd. of Teamsters*, 107 Wn.2d 524, 530, 730 P.2d 1299, *cert. denied*, 484 U.S. 815 (1987).

■ Mr. Valentine was charged with violating RCW 9A.36.031(1)(g),[5] which provides that a person is guilty of third degree assault if he or she "[a]ssaults a law enforcement officer . . . who was performing his or her official duties at the time of the assault." During the process of a lawful arrest, an arrestee or an interested third party may not use force against the arresting officer unless the arrestee can show he or she was in actual danger of serious injury. *State v. Holeman*, 103 Wn.2d 426, 430, 693 P.2d 89 (1985); *State v. Ross*, 71 Wn. App. 837, 843, 863 P.2d 102 (1993); *State v. Smits*, 58 Wn. App. 333, 341, 792 P.2d 565 (1990). In the event an arrest is unlawful, however, the arrestee has the right to resist as long as the resistance is reasonable and proportioned to the injury threatened. *State v. Hornaday*, 105 Wn.2d 120, 131, 713 P.2d 71 (1986); *State v. Crider*, 72 Wn. App. 815, 820, 866 P.2d 75 (1994). The use of force to prevent an unlawful arrest which threatens only a loss of freedom, however, is not reasonable. *Crider*, at 820; *Seattle v. Cadigan*, 55 Wn. App. 30, 37, 776 P.2d 727, *review denied*, 113 Wn.2d 1025 (1989). Some courts have ruled that the

---

[5]The information listed RCW 9A.36.031(1)(f) as the basis for the charge. The statute was amended in 1990 and the applicable subsection is now (1)(g). Laws of 1990, ch. 236, § 1.

*Holeman* standard requiring actual threat of serious bodily injury applies to both lawful and unlawful arrests under RCW 9A.36.031(1)(g). *Ross*, at 842-43; *Smits*, at 341.

Whether or not the arrest here was lawful, Mr. Valentine did not have the right to resist with force unless he was threatened with at least more than a mere loss of freedom. *Crider*, at 820. The record shows that Officer Moore told Mr. Valentine he was under arrest; Mr. Valentine responded by walking away from the officer, opening his car door and reaching inside. Both Officer Moore and Officer Robinson testified they grabbed Mr. Valentine because they feared he was attempting to avoid arrest by getting in his car. Sufficient evidence was presented to the jury to find that Mr. Valentine was threatened only with a loss of freedom and he therefore had no right to use force. *Caruso*, at 530.

Mr. Valentine next contends the phrase "if you so find" in instruction 17 removes the State's burden to prove Mr. Valentine's lack of reasonableness beyond a reasonable doubt. He asserts this phrase allows the jury to find lack of reasonableness — and therefore an unlawful use of force to resist unlawful arrest — with only a scintilla of evidence. In effect, he argues, the sentence creates an irrebuttable presumption regarding the element of reasonable force: if the jury finds, even by a mere preponderance of the evidence, the arrest threatened only a loss of freedom, it must find that Mr. Valentine's use of force to resist the arrest was unreasonable.

The sentence Mr. Valentine disputes in instruction 17 is not a presumption; it is a rule of law. *See State v. Rousseau*, 40 Wn.2d 92, 94, 241 P.2d 447 (1952); *Crider*, at 820. Instructions 8, 10 and 17, when read together, informed the jury of the following: (1) the State must prove assault beyond a reasonable doubt; (2) use of unlawful force constitutes assault; (3) any force used to resist an arrest which only threatens a loss of freedom is unlawful; and (4) the State has the burden of proving beyond a reasonable doubt the force used by Mr. Valentine was unlawful. Similar instructions on a defense to a charge of first degree assault were approved in *State v. Hoffman*, 116 Wn.2d 51, 108-09,

804 P.2d 577 (1991). When read together, the instructions here, like the corresponding instructions in *Hoffman*, properly informed the jury that the State bore the burden of proving the force used was unreasonable beyond a reasonable doubt. *Hoffman*, at 109.

■ Mr. Valentine also assigned error to the court's refusal to give his proposed instructions 9 and 10.[6] He does not, however, address the issue in his brief. We will not engage in conjectural resolution of issues presented but not briefed. *In re F.D. Processing, Inc.*, 119 Wn.2d 452, 456, 832 P.2d 1303 (1992). The proposed instructions, moreover, repeat instructions already submitted and are incomplete statements of the law. *See State v. Jones*, 63 Wn. App. 703, 707, 821 P.2d 543, *review denied*, 118 Wn.2d 1028 (1992). When read together, they fail to address the standards for lawful resistance to unlawful arrest established in *Hornaday*, at 131, and *Crider*, at 820.

Mr. Valentine next contends a section of instruction 15 constitutes an improper comment by the judge on matters of fact. Instruction 15 reads as follows:

> It is lawful for a police officer to arrest an individual when he/she has reasonable grounds to believe that the person has committed or is committing a crime in his/her presence. Probable cause exists to make an arrest when the facts, circumstances and information within the officer's knowledge are sufficient to warrant a person of reasonable caution in believing that the person has committed or is committing a crime.
>
> *The officer need not be able to correctly articulate the proper or specific crime at the time the arrest is made.*
>
> An arrest made by a police officer based upon probable cause as defined above is a lawful arrest.

(Italics ours.) Mr. Valentine asserts the emphasized statement above directs the jury to ignore the issue of probable

---

[6]"A person arrested without lawful authority may forcibly resist that arrest so long as the force is no more than is necessary as defined elsewhere in these instructions." Proposed instruction 9.

"Necessary means that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended, under the circumstances as they reasonably appeared to the actor at the time." Proposed instruction 10.

cause to arrest and indicates the opinion of the judge regarding the officers' credibility. We disagree.

█ An instruction is not a comment on the evidence if it is an accurate statement of the law. *State v. Ciskie,* 110 Wn.2d 263, 282-83, 751 P.2d 1165 (1988). The disputed portion of instruction 15 accurately paraphrases a quote in *State v. Goodman,* 42 Wn. App. 331, 711 P.2d 1057 (1985), *review denied,* 105 Wn.2d 1012 (1986): "'[W]e would not consider ourselves bound by a police officer's inability to articulate his conclusions if the facts clearly demonstrated the existence of probable cause.'" *Goodman,* at 337 (quoting *United States v. Day,* 455 F.2d 454, 456 (3d Cir. 1972)).

### III

#### RESPONSE TO DISSENT

The due process issue raised by the dissent compels further comment. Our colleague states that the record reveals a violation of "constitutional principles of fundamental fairness", dissent at 621, which, although not argued on appeal, must be raised sua sponte by this court in order to properly decide the case. RAP 12.1(b). When issues essential to appellate review are inexplicably ignored by the parties, the court "may notify the parties and give them an opportunity to present written argument on the issue raised by the court." RAP 12.1(b); *Obert v. Environmental Research & Dev. Corp.,* 112 Wn.2d 323, 333, 771 P.2d 340 (1989). We find, however, that the issues of the unlawful arrest and the reasonable resistance to that arrest were adequately presented to the jury in the instructions. See instructions 15, 17.

█ The conduct of law enforcement officers does not violate due process unless it is "'so shocking as to violate fundamental fairness.'" *State v. Myers,* 102 Wn.2d 548, 551, 689 P.2d 38 (1984) (quoting *State v. Smith,* 93 Wn.2d 329, 351, 610 P.2d 869, *cert. denied,* 449 U.S. 873 (1980)). The fundamental fairness guaranty "is not established merely upon a showing of obnoxious behavior or even flagrant misconduct on the part of the police . . .'". *Myers,* at 551 (quoting *United States v. Kelly,* 707 F.2d 1460, 1476 (D.C. Cir.), *cert. denied,*

464 U.S. 908 (1983)). In order to prove the requisite level of outrageousness, the defendant must present substantial evidence of coercion, violence or brutality. *Myers,* at 551; *see Irvinev. California,* 347 U.S. 128, 133, 98 L. Ed. 561, 74 S. Ct. 381 (1954).

██ We must uphold a jury's verdict if it is based upon substantial evidence. *Lillig v. Becton-Dickinson,* 105 Wn.2d 653, 658, 717 P.2d 1371 (1986). Evidence is "substantial" when it is in "sufficient quantum to persuade a fair-minded person of the truth of the declared premise." *Ridgeview Properties v. Starbuck,* 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). Here, the jury received instructions clearly defining lawful and unlawful arrest and the limits of reasonable resistance to arrest under Washington law. These instructions, especially instructions 15 and 17, are supported by sufficient evidence for the jury to find Mr. Valentine assaulted Officer Moore while resisting arrest and this assault was unreasonable under the particular circumstances of that arrest.

It is axiomatic that an appellate court must take great care not to substitute its own judgment for that of the jury's. *Lillig,* at 657. This court will rarely overturn a jury's verdict,

> and then only when it is clear that there was *no* substantial evidence upon which the jury could have rested its verdict. . . . The credibility of witnesses and the weight to be given to the evidence are matters within the province of the jury and even if convinced that a wrong verdict has been rendered, the reviewing court will not substitute its judgment for that of the jury, so long as there was evidence which, if believed, would support the verdict rendered.

(Italics ours.) *State v. O'Connell,* 83 Wn.2d 797, 839, 523 P.2d 872, 77 A.L.R.3d 874 (1974), *quoted in Lillig,* at 657.

Appellate courts have a very limited franchise to impose their judgments on citizens in a free and democratic society. Although the dissent notes that several cases have postulated there may be situations wherein outrageously unlawful conduct by police would "absolutely bar" conviction (*see, e.g., United States v. Russell,* 411 U.S. 423, 431-32, 36 L. Ed. 2d 366, 93 S. Ct. 1637 (1973)), the fact remains that such

situations are almost never found. (See the list of federal cases upholding verdicts involving a wide variety of police misconduct in *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991).) We must reiterate that the jury, cognizant of Mr. Valentine's right to reasonably resist an unlawful arrest which threatens more than a mere loss of freedom (*State v. Crider*, 72 Wn. App. 815, 820, 866 P.2d 75 (1994); *Seattle v. Cadigan*, 55 Wn. App. 30, 37, 776 P.2d 727, *review denied*, 113 Wn.2d 1025 (1989)), chose to believe the testimony of the police witnesses. We are constrained to accept that verdict as based on substantial evidence in the record. *Lillig*, at 658.

The judgment of the trial court is affirmed.

MUNSON, J., concurs.

SCHULTHEIS, J. (dissenting) — I respectfully dissent. I cannot endorse the majority's opinion because it does not address the real issue in this case. It is the duty of the courts to ensure the integrity of the criminal justice system and safeguard citizens from egregious police conduct that exceeds principles of fundamental fairness and due process of law. My review of the record leaves me with a deep and abiding certainty that the State violated constitutional principles of fundamental fairness by convicting Mr. Valentine for a crime which it provoked.[7] *See* Paul G. Chevigny, *The Right to Resist an Unlawful Arrest*, 78 Yale L.J. 1128 (1969).

Manifest error affecting a constitutional right may be addressed for the first time on appeal. RAP 2.5(a). Although the parties have not raised this issue, either before the trial court or on appeal, we may consider any issue necessary for a proper decision and may decide the case on that basis. RAP 12.1(b); *State v. Danforth*, 97 Wn.2d 255, 643 P.2d 882 (1982); *Siegler v. Kuhlman*, 81 Wn.2d 448, 502 P.2d 1181

---

[7]Instructions 15 and 17, which address when an arrest is lawful and the scope of an individual's right to resist an unlawful arrest, do not adequately address the issue of intentional provocation. The constitutionality of the law enforcement officers' actions was not before the jury.

(1972), *cert. denied*, 411 U.S. 983 (1973); *Crawford v. Wojnas*, 51 Wn. App. 781, 786-87, 754 P.2d 1302, *review denied*, 111 Wn.2d 1027 (1988).

The majority's statement of facts places too much emphasis on the apprehension of Mr. Valentine and too little emphasis on police actions preceding the physical altercation.

Officer Richard Robinson testified he was driving west on First Avenue when he "saw a suspicious subject on the corner at First and Jefferson". He did not recognize the man, so he asked Officer John Moore via portable radio if Officer Moore recognized him. Officer Moore testified he was driving westbound in the alley south of the 1100 block of West First, in his plain white unmarked car, when Officer Robinson asked him on his portable radio if he "knew somebody standing at First and Jefferson that was wearing a black coat". When Officer Moore got to the end of the alley and came out onto Jefferson, he looked for somebody in a "black coat" but all he saw was somebody bending down and getting into a car near the intersection of Jefferson and First, "and he had a black coat on".

Officer Moore testified the vehicle made a right turn at the intersection, onto First, without signaling,[8] so he "told Officer Robinson on the radio that I did have a violation on the driver of the vehicle, he hadn't signalled for a turn, and that I was going to stop the car." This was clearly a pretextual stop.

Officer Moore followed the vehicle and turned on his police lights. He testified that as he did so, he recognized the car and Mr. Valentine. Officer Moore had cited Mr. Valentine twice for failure to have a front license place: the second time was on May 12, just 4 days earlier, and the first time was about a month earlier. Officer Moore reported over his radio that the person he was following was Mr. Valentine.

Officer Richardson followed Officer Moore to provide backup assistance. When Mr. Valentine pulled to the side of

---

[8]Mr. Valentine testified he signaled by hand because he was aware of Officer Moore's presence and his turn signals were not working.

the street $3^1/2$ blocks later, Officer Moore approached him and Officer Richardson went to the passenger side. Although he knew why Officer Moore had followed Mr. Valentine, there is no indication that Officer Richardson informed him that this was not the "suspicious subject" about whose identity he had inquired.

Officer Jay Jones pulled up and stopped near the front of Mr. Valentine's car. He stayed on his motorcycle since "[t]hings looked like they were pretty well under control". Officer Moore asked Mr. Valentine for his license; Officer Richardson asked the two passengers for identification, and had them get out of the car while he ran their identities through the police computer.[9] Sergeant Michael Yates and Detective Robert Webb arrived at the scene.

Mr. Valentine complained to Officer Moore about being harassed. He used profane language. But he also handed Officer Moore his license, as requested, and his registration, which the officer had not yet requested. He got out of his car and walked to the front to show the officer that he had attained a front license plate. His actions imply cooperation. And Officer Jones' testimony corroborates Mr. Valentine's claim that he was cooperating.

Officer Moore testified that although he had Mr. Valentine's license and registration, he could not fill out the citation without a current address. Officer Moore further testified that Mr. Valentine refused to provide his current address; therefore, Officer Moore told him he was under arrest for failure to cooperate and for failure to sign a notice of infraction.[10] Officer Moore did not have his citation book in

---

[9]The stopping of a vehicle based on an infraction committed by the driver does not, by itself, provide an officer with grounds to require identification of passengers. *State v. Larson*, 93 Wn.2d 638, 642, 611 P.2d 771 (1980). Officer Robinson's treatment of Mr. Valentine's passengers lends credence to the allegation of police harassment.

[10]Mr. Valentine testified Officer Moore told him he was taking him to jail and towing his car, and that is why he went back to roll up the window and lock the door. He did not want people going through his personal effects. Considering the presence of two passengers in the vehicle, either of whom presumably could have

hand, however, and did not present Mr. Valentine with a citation for his signature.[11]

Mr. Valentine produced evidence that he had notified the Department of Licensing in January 1990 that he had moved and had attached a sticker with his new address on the back of his license, as directed. He testified that Officer Moore had obtained his address from the sticker for the citation he had written 4 days earlier. Officer Moore testified he knew from the previous contracts that the address on the front of Mr. Valentine's license was not current, but he did not think he looked on the back of the license on this occasion.

Sergeant Yates, who applied the "carotid hold"[12] to Mr. Valentine during the scuffle, testified he headed toward the area as soon as he heard it was Mr. Valentine being stopped. The officer acknowledged he had engaged in a contest of one-upmanship with Mr. Valentine during the previous day's altercation at a tavern. He also acknowledged that, as a result of the tavern argument, it was probable the officer had discussed Mr. Valentine at the swing shift roll call which took place just an hour or two before the incident at issue.

I am not surprised that Mr. Valentine expressed outrage at his treatment by these police officers, or that he believed he was being harassed. The record permits no other conclusion.

The Supreme Court has recognized that a situation can exist "in which the conduct of law enforcement agents is so

---

driven it, one wonders whether the police had reasonable cause for impounding it. *See State v. Malbeck*, 15 Wn. App. 871, 874-75, 552 P.2d 1092 (1976).

[11]Officer Moore testified he never approached a car with a ticket book at night; he would take a flashlight instead. The stop here, however, took place in the middle of the day. Mr. Valentine later signed a citation presented to him at the hospital. Officer Moore had filled in the form with an address he obtained from Mr. Valentine's checkbook, taken by another officer from the vehicle's glovebox.

[12]According to Sergeant Yates and Detective Webb, the carotid hold is a degree of force just short of deadly force. It is generally used only in life-threatening situations.

outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . .". *United States v. Russell*, 411 U.S. 423, 431-32, 36 L. Ed. 2d 366, 93 S. Ct. 1637 (1973). In determining whether police conduct is outrageous, the totality of the circumstances must be considered. *See United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir.), *reh'g granted, vacated on other grounds and remanded with respect to one defendant sub nom. United States v. Wingender*, 790 F.2d 802 (1986). In order to constitute a due process violation, the conduct must be so outrageous as to shock the conscience of the court. *United States v. Osborne*, 935 F.2d 32, 36 (4th Cir. 1991).

The flagrant abuse of police authority in this case was much more than obnoxious behavior; it was disturbingly reminiscent of police state tactics. Such tactics have no place in a free and democratic society. Yet, as my colleagues point out, courts have been hesitant to find other instances of police misconduct sufficiently egregious to constitute due process violations. This generalized acceptance by the judiciary of law enforcement excesses threatens to undermine the integrity upon which our criminal justice system is based. The fact that other courts have developed a high shock threshold in the face of reprehensible law enforcement conduct does not persuade me that this court should sanction what transpired here.

I do not believe this appeal can be properly decided without addressing the constitionality of these officers' actions. Therefore, I would call for supplemental briefing on this issue as authorized by RAP 12.1(b) and would decide the case on that basis.

Review granted at 128 Wn.2d 1001 (1995).