IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68511-2-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GARRETT MATTHEW TURSKI, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: March 25, 2013 |
| | ) | |

VERELLEN, J. — Garrett Turski was convicted of vehicular manslaughter based on

evidence that he was intoxicated when he crashed his car, resulting in the death of

Ellen Floyd. Turski contends that the trial court's exclusion of two exhibits deprived him

of his right to confront witness Leanne Floyd[1] concerning her credibility or bias, and that

the trial court erred in denying his motion for a new trial after he presented evidence that

Floyd initiated a civil lawsuit shortly after his conviction. Turski demonstrates no

reversible error or basis for a new trial. We affirm.

FACTS

On April 9, 2010, Turski drove his car to pick up Ellen at her home. The two later

met up with Charlene Beardsley, and went out to a party. They returned to Beardsley's

residence later that night. During the night, Ellen and Turski consumed alcohol. Early

the next morning, Turski and Ellen left Beardsley's residence. A security video showed

---

[1] For the sake of clarity, Ellen Floyd will be referred to by her first name and
Leanne Floyd by her last.

Ellen riding piggyback on Turski, as he carried her to his car and placed her in the passenger seat, before driving off. Another set of videos from a nearby convenience store showed Turski entering the store and making a purchase, then returning to his car. The video did not clearly reveal who was driving.

Shortly thereafter, Turski and Ellen were in an automobile accident. Ellen was thrown from the car and killed. Turski survived. He was found by emergency personnel, partially in the backseat and partially in the trunk of his car. He admitted drinking, but denied that he was driving. Tests confirmed that he had a blood-alcohol level of .11 grams of alcohol per 100 milliliters of blood.

Turski was charged with vehicular homicide. The case proceeded to a jury trial. The defense theory was that Ellen was driving, not Turski.

The State presented physical evidence that Turski was the driver. Detective Joseph Goffin testified that the car entered a curve at over 100 miles per hour and skidded off the road. The passenger side hit a dirt embankment, ripping open the passenger door. The car then rotated out from underneath Ellen, who struck the passenger door and pillar, leaving traces of her hair on both. She was thrown from the car, leaving traces of her hair on trees she hit. She died instantly. Goffin explained that Turski's theory that Ellen was driving was not consistent with the location of her hair on the trees, because her body would have been travelling in a different direction had she been thrown from the driver's seat.[2]

---

[2] Turski's theory depended in part on the testimony of defense expert Dr. Steven Mitchell that abrasions on Turski's shoulder and waist and his fractured sternum indicated that he was wearing the passenger-side seatbelt. However, Detective John Cummings, a seatbelt expert, testified that the car's seatbelts were functioning properly and were not in use at the time of the accident.

Turski's car had a manual transmission. There was evidence that Ellen was not able to drive a car with a manual transmission, and rarely drove at all. Beardsley testified that she never saw Ellen driving a car, and that "friends drove her around."[3] The security video that showed Turski carrying Ellen from Beardsley's residence and putting her in the passenger seat of his car was played for the jury.

Deputy Robert Funston described a second video, taken from the convenience store, showing Turski's car pulling smoothly out of the parking lot: "[T]he first motion was backwards, and then a smooth acceleration to the forward."[4] That video was played for the jury.[5]

Floyd, Ellen's mother, testified that Ellen took driver's education at high school but was unable to drive a car with a manual transmission. Floyd also testified that Ellen had a car with a manual transmission, but did not drive it because "[i]ts clutch ended up going, and the motor didn't run."[6] In the meantime, Ellen did not "do any driving around

---

[3] Report of Proceedings (RP) (Feb. 6, 2012) at 130-31.

[4] RP (Feb. 9, 2012) at 324.

[5] At trial, the parties presented testimony regarding images captured by the outdoor camera. Turski's expert witness described a process of enhancement he performed on the images, and claimed that the enhanced image revealed shapes inside the car that indicated, to him, that a person in the driver's seat was "perched" on the edge of the seat. Turski contended that this was consistent with a driver of Ellen's 5' stature, but not of Turski's stature (Turski is approximately 5'11"). The State argued that any conclusions drawn from the enhanced images were based on speculation, and that the images also could be interpreted as showing a driver with Turski's hair color, which was lighter than Ellen's. The State argued that the car's smooth transition from reverse to first gear and its subsequent peeling out from the parking lot revealed an experienced driver like Turski, not an inexperienced driver perched on the edge of the seat.

[6] RP (Feb. 8, 2012) at 87-88.

3

town," but "would have someone come and pick her up, or she would walk."[7] Floyd also testified that Ellen was five feet tall and weighed 100 or 102 pounds.

On cross-examination, Floyd acknowledged that she had hired civil attorneys shortly after the accident, and that the attorneys were present during her interview with Turski's counsel before trial and were in the courtroom during Turski's criminal trial. Turski questioned Floyd about her financial motivation in hiring the attorneys soon after her daughter's death. Floyd testified that financial considerations were not "the reason" she hired counsel. Floyd testified she hired counsel "[s]o that I could be heard, so that I could have somebody stand up and take accountability for the death of my daughter.[8] Counsel then inquired:

Q. Do you deny that your attorneys are demanding hundreds of thousands of dollars from the Turski family?

A. Yes, I do.

Q. Do you deny that?

A. Yes, because we have not asked them for any money. The only finances I asked for was money to help bury my child.

Q. How are they being paid?

A. How is who being paid?

Q. Your attorneys, Adler Giersch.

A. I don't know.

Q. It's on a contingent fee basis, isn't it; they get a percentage of the money collected?

A. From the car insurance?

Q. From the insurance, and from the Turskis personally.

---

[7] Id. at 87.

[8] Id. at 98.

A.   Not that I know of, sir.

Q.   You didn't sign a fee agreement?

A.   I did.

Q.   You don't remember what it says?

A.   No.[9]

Following Floyd's testimony, Turski sought to admit two exhibits: (1) an April 26, 2010 letter from Floyd's attorneys to Turski's Safeco insurance representative, demanding disclosure of Turski's liability insurance policy limits (exhibit 110); and (2) a March 14, 2011 letter from Safeco to Turski, revealing that counsel for Floyd had not at that time demanded tender of Turski's $250,000 policy limits (exhibit 111).[10]

The trial court concluded that the first letter, exhibit 110, was not relevant to show Floyd's bias:

> The relevance of this letter is apparently to show two things; one, that there is a claim for monetary losses. The letter itself doesn't say what that claim is . . . . [T]he letter only says that money is involved. . . .
>
>      . . . .
>
>      The other reason why this letter, Exhibit 110, might be relevant is . . . it shows the date of the letter, which . . . could contradict the witness. The problem with that, though, is even though I think the defense has every right to bring in extrinsic evidence of the witness's bias, the date isn't really evidence of the witness's bias. The date is simply a point where the witness may have been wrong; but since it doesn't go to bias, and since it has not been demonstrated to me that it has anything to do with the charges or any defense in this case, I think it's collateral. . . . I'm not going to permit extrinsic evidence to be presented to contradict this witness on the matter of the date of the letter.[11]

---

[9] Id. at 98-99.

[10] Turski attached other letters to his opening brief, but those letters were not offered at trial. We do not consider exhibits that are not part of the record on appeal. The State's motion to strike is granted.

[11] RP (Feb. 9, 2012) at 163-65.

The trial court concluded that the second letter, exhibit 111, did not reveal that Floyd was aware of its contents and was, therefore, not relevant to impeach her credibility:

> Unless we had testimony, which we did not, that [Floyd] had read this letter and it was wrong, I don't see how this letter would tend to impeach her. This is a letter from the defendant's insurance company to the defendant's father. . . . Mrs. Floyd[ ]never said anything that this letter—that she apparently never saw or there's no evidence that she ever saw—could contradict. So 111 will not be admissible, either.[12]

The court was careful to explain it was not precluding other evidence of Floyd's "stake in the outcome."[13]

The jury convicted Turski. Before sentencing, Turski filed a motion for a new trial, and presented newly discovered evidence that Floyd filed her civil lawsuit seeking Turski's $250,000 insurance limits less than two weeks after Turski's conviction.

The trial court denied Turski's motion for a new trial. The court concluded that evidence of Floyd's civil lawsuit would only be potentially relevant to impeach her uncontradicted testimony that Ellen could not drive a stick shift:

> The impeachment is on the subject of whether or not Ellie could drive a stick shift; not whether or not she was driving the particular stick shift of that Mustang, but simply whether she could drive a stick shift. Her mother wasn't there that night and cannot say who was in the driver's seat. . . .
>
> . . . .
>
> There really wasn't anybody in the trial who was prepared to testify or who did testify to the opposite proposition, which was that Ellie could drive a stick and was competent at driving a standard transmission.[14]

---

[12] Id. at 168.

[13] Id. at 169.

[14] RP (Mar. 7, 2012) at 852-53.

The court determined the impeachment value of the new evidence was slight, given the other corroborating evidence, and would not have affected the trial outcome:

> [W]ithout anybody to take the opposite view in this trial, it's hard to see how much of a difference that could have made.
>
>      . . . .
>
> There was also . . . evidence from the defendant himself that he tended not to let other people drive his car, which is something that was before the jury. . . . And then, of course, there was the videotape [from the convenience store], which both sides made much of. . . .
>
> . . . It's hard to say, therefore, that impeachment evidence here would have impacted the outcome or even probably have changed the result.[15]

The court also noted that Turski impeached Floyd's testimony with evidence of her potential financial motivation, and that the new evidence would be cumulative:

> I did go back and examine the cross-examination of Ms. Floyd. I think I would have to characterize it as quite thorough, especially on this point. It may well be, Mr. Hansen, that you didn't get the answer you were seeking; but, quite honestly, the answer you got must have been sufficient for the point you were making, because you established that (1) Ms. Floyd had hired lawyers and (2) there's a fee agreement, whatever it said. . . . It is hard to see what other purpose a jury would expect civil lawyers to serve if not to at least consider filing a lawsuit. That's what they were there for, that's what they were involved for, and that was established. . . . The point was made on cross-examination; and anything more would have been not merely impeaching, but also cumulative.[16]

Turski appeals from the judgment and sentence and from the order denying his motion for a new trial.

---

[15] Id. at 853-55.

[16] Id. at 857.

DISCUSSION

*Exclusion of Evidence*

Turski contends that the trial court erred by excluding evidence that Floyd had engaged attorneys to seek compensation for losses resulting from her daughter's death.

Appellate courts review a trial court's evidentiary rulings for an abuse of discretion.[17] The scope or extent of cross-examination of a witness is "'a matter in the sound discretion of the court.'"[18]

A defendant's right to impeach a witness with evidence of bias or a prior inconsistent statement is guaranteed by the right to confront witnesses.[19] Because cross-examination of a witness for the purpose of showing bias, prejudice or interest is a matter of right, a total denial of cross-examination regarding the existence of civil claims that the witness may have against a defendant is an abuse of discretion.[20]

---

[17] State v. Ortiz, 119 Wn.2d 294, 308, 831 P.2d 1060 (1992). Discretion is abused if it is based on untenable grounds or untenable reasons. State ex rel Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). A trial court's ruling as to the scope of an examination will not be disturbed absent a manifest abuse of discretion by the trial court. State v. Mak, 105 Wn.2d 692, 710, 718 P.2d 407 (1986).

[18] State v. Whyde, 30 Wn. App. 162, 166-67, 632 P.2d 913 (1981) (quoting 5 R. MEISENHOLDER, WASHINGTON PRACTICE § 299, at 264 (1965)). Bias and interest are relevant to the credibility of a witness. State v. Tate, 2 Wn. App. 241, 247, 469 P.2d 999 (1970); State v. Wills, 3 Wn. App. 643, 645, 476 P.2d 711 (1970).

[19] Davis v. Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." Id. Any error in excluding evidence is presumed prejudicial and requires reversal unless no rational jury could have a reasonable doubt that the defendant would have been convicted even if the error had not taken place. Id. at 318.

[20] Villaroman v. United States, 184 F.2d 261, 262 (D.C.Cir. 1950); Whyde, 30 Wn. App. at 166-67.

8

Turski's cross-examination established that (1) Floyd had a financial interest in the outcome of the trial; (2) she had hired attorneys for purposes that included obtaining financial compensation for her daughter's death; and (3) she did not recall all of the details of her fee arrangement or the timing of her initial contact with counsel. By cross-examining Floyd about her potential bias and details of her representation, Turski availed himself of his right to confront Floyd to establish an evidentiary basis for impeaching her credibility and objectivity.

Despite the fact that his cross-examination established Floyd's potential bias, Floyd asserts that the trial court erred by excluding exhibits 110 and 111. But exhibit 110, at most, reveals that Floyd was represented by counsel, there was a claim for losses, and counsel sought information about Turski's insurance policy. Exhibit 111, at most, reveals that Safeco was trying to settle for the $250,000 policy limits, but Floyd had not yet demanded payment of the policy limits.

Turski contends that the exclusion of this evidence was error, in part, because "the only issue was whether the daughter or the defendant was driving the car at the time of the accident," and Floyd's testimony was "critical" to the State's proof of that fact.[21] Turski cites to State v. Johnson,[22] State v. Smits,[23] State v. Whyde,[24] State v.

---

[21] Appellant's Br. at 1.

[22] 90 Wn. App. 54, 70-71, 950 P.2d 981 (1998) (reversing conviction where a defendant was entirely precluded from impeaching an assault victim's testimony that directly contradicted prior statements relevant to his financial motive). In contrast to the witness in Johnson, Floyd's testimony was not directly contradicted by prior statements attributable to her.

[23] 58 Wn. App. 333, 339, 792 P.2d 565 (1990) (reversing conviction where defendant was completely precluded from any inquiry into witness's possible suit or financial interest). In contrast to the defendant in Smits, Turski questioned Floyd about her financial motive and bias. Turski was only limited from attempting to impeach Floyd with extrinsic evidence obliquely related to a financial bias or motive.

Roberts,[25] and State v. Smith.[26] In those cases, the defendants were either completely prohibited from presenting impeachment of an important witnesses, or the testimony from the complaining witness was the central evidence relied on by the State to prove the charges.

Importantly, Floyd's testimony about Ellen's inability to drive a car with a manual transmission was only a portion of the State's evidence that Turski was the driver. Detective Goffin testified at length about the evidence he considered in reconstructing the accident and his conclusion that Turski was the driver. Deputy Funston described the videos showing Ellen in the passenger seat and Turski in the driver's seat as the two left Beardsley's residence, and the video from the convenience store shortly before the accident. The jury was shown these videos, as well as numerous exhibits documenting the accident and its reconstruction.

And, in contrast to Johnson and Smits, in Turski's case, the trial court did not preclude Turski from impeaching Floyd's testimony. It simply excluded the two offered exhibits because they did not accomplish that purpose:

---

[24] 30 Wn. App. 162, 165-67, 632 P.2d 913 (1981) (reversing conviction where (1) trial court precluded any evidence of complaining witness's threat to sue defendant; (2) the "entire prosecution depended upon the credibility" of the witness; (3) there was "a total absence of any testimony that did not depend on [the witness's] credibility;" (4) there was no "physical evidence to support the prosecution;" and (5) the prosecutor argued that the complaining witness had no interest or bias. None of these factors are present in Turski's case.

[25] 25 Wn. App. 830, 835-36, 611 P.2d 1297 (1980) (reversing conviction where defendant was precluded entirely from cross-examining alleged rape victim regarding whether her testimony that the sex was not consensual was coerced).

[26] 130 Wn.2d 215, 226-27, 922 P.2d 811 (1996) (defendant was precluded from impeaching police officer's testimony, where the officer was the only witness to testify about defendant's apparent intoxication before his arrest).

> Now, please understand, my ruling doesn't say—I'm not ruling right now, and I haven't ruled, that evidence of a stake in the outcome couldn't be admissible. I'm just saying 110 and 111 are not admissible for the reasons I've given.[27]

Moreover, Floyd's testimony concerning Ellen's driving ability and stature was corroborated by other evidence. Thus, her testimony was significantly less crucial to the State's case than the testimony at issue in Roberts, Smith, or Whyde. Beardsley confirmed that Ellen could not drive a manual transmission. Deputy Christopher Veentjer, who knew Ellen from previous contacts and identified her at the crash site, also testified about Ellen's height and weight. Turski contended that he could not remember the accident, or events immediately before and after. He acknowledged that, prior to the night of the accident, he had not allowed Ellen to drive his car. Turski also stated that Ellen did not usually drive, and stated, "That's why I'd pick her up."[28] He testified that he had never seen Ellen driving around town, and that he regularly drove Ellen to meet Beardsley.

Given these critical distinctions, Johnson, Smits, Whyde, Roberts, and Smith do not compel reversal in Turski's case. Turski fails to demonstrate that he was denied the opportunity to confront Floyd, or that the trial court abused its discretion.

*Motion For New Trial*

Turski argues that the trial court erred in denying his motion for a new trial after he presented evidence that, less than two weeks after his guilty verdict, Floyd filed a civil lawsuit against him seeking his $250,000 insurance limits. We disagree.

---

[27] RP (Feb. 9, 2012) at 169.

[28] RP (Feb. 14, 2012) at 740.

An appellate court reviews a trial court's ruling on a motion for relief from judgment for an abuse of discretion.[29] CrR 7.8(b)(2) allows the trial court to grant a party relief from a final judgment based on newly discovered evidence.[30] The trial court will not grant a new trial on the basis of newly discovered evidence unless the moving party demonstrates that the evidence "'(1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching.'"[31] Absence of any one of such five factors is grounds for denial of a new trial.[32]

The record supports the trial court's determination that the new evidence would not likely change the outcome of the trial. The existence of Floyd's posttrial lawsuit was not wholly inconsistent with her testimony, and did not "devastate" any uncorroborated testimony or the credibility of a key witness.[33] Turski fails to demonstrate that the trial court abused its discretion by denying a new trial.

---

[29] State v. Robinson, 104 Wn. App. 657, 662, 17 P.3d 653 (2001).

[30] CrR 7.8(b)(2) provides that "[o]n motion and upon such terms as are just, the court may relieve a party from a final judgment, order, or proceeding for the following reasons: . . . . Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 7.5."

[31] State v. Gassman, 160 Wn. App. 600, 608-09, 248 P.3d 155, review denied, 172 Wn.2d 1002 (2011) (quoting State v. Williams, 96 Wn.2d 215, 223, 634 P.2d 868 (1981)).

[32] Id. at 609.

[33] See State v. Savaria, 82 Wn. App. 832, 837-38, 919 P.2d 1263 (1996) (overruled in part on other grounds by State v. C.G., 150 Wn.2d 604, 80 P.3d 594 (2003)); see also State v. Roche, 114 Wn. App. 424, 437, 59 P.3d 682 (2002) (granting a new trial where new evidence of malfeasance by the crime lab technician "totally devastated" the credibility of the technician's testimony regarding his testing of the alleged controlled substance and proper preservation of the chain of custody of the evidence).

Finally, Turski asserts that Floyd's attorneys had an ethical duty to prevent or correct Floyd's testimony. Turski fails to identify authority for the proposition that the civil attorneys' purported omissions below provide a basis for appellate relief in his criminal case. Nor does Turski provide any authority supporting his request that this court compel discovery of communications between Floyd and her counsel.

The conviction is affirmed.

WE CONCUR: