IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31158-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TYLER JOHN MARKWART, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Tyler Markwart appeals his convictions for manufacturing marijuana, possession with intent to sell marijuana, and three counts of delivering marijuana. He asks this court to dismiss the charges on the ground of police misconduct. In the alternative, he seeks a new trial on the grounds that the trial court refused to instruct the jury on his defenses of entrapment and under the former Washington State Medical Use of Marijuana Act (MUMA), chapter 69.51A RCW (1999). Because law enforcement officers engaged in a permissible ruse, we reject Markwart's request to dismiss for police misconduct. We reverse the convictions of manufacturing and possession with intent to sell, because, under our recent decision, *State v. Shupe*, 172 Wn. App. 341, 289 P.3d 741 (2012), *review denied* 177 Wn.2d 1010 (2013), decided after

trial, the jury should have considered Markwart's medicinal marijuana defense. We affirm the convictions for delivery of marijuana.

FACTS

Tyler Markwart's claim of police misconduct arises from his contact with members of the Pullman Police Department and the Quad Cities Drug Task Force. This interaction began, in August 2009, when an electrician reported to Pullman police that he saw marijuana, paraphernalia, and possible supplies to grow marijuana in an apartment, located at 1920 NE Terre View Dr., #J209, where he performed work. The address is part of Campus Common North at Washington State University. Police applied for and executed a search warrant for the apartment. Tyler Markwart and Michael Pecharko rented the apartment, but only Pecharko was home when police executed the search warrant. Police located marijuana plants and a handgun inside the apartment. Pecharko claimed ownership to the handgun and produced forms authorizing him to possess marijuana as a qualifying patient under MUMA. Police tentatively decided not to file criminal charges so long as Tyler Markwart, when he returned, produced an authorization form for medicinal marijuana. The next day Markwart produced his authorization form.

In February 2011, police interviewed Tyler Markwart at his home as part of a robbery investigation. Officer Aaron Breshears of the Pullman Police Department investigated the burglary and received Markwart's consent to search his residence, where the officer observed a marijuana grow operation. During the burglary investigation,

2

Markwart disclosed to police that he operated Allele Seeds Research, a dispensary for medical marijuana patients. As proof, he produced medical marijuana forms. Upon reviewing Markwart's paperwork, Officer Breshears determined Markwart's grow operation was in compliance with the law, but he suggested Markwart tell other growers to register their operations with the police department to avoid "pesky search warrants." Clerk's Papers (CP) at 315.

Officer Aaron Breshears notified all Pullman police via e-mail that marijuana growers may come to the police department to register their respective operations and disclosed that, during the search of Tyler Markwart's home, officers found firearms and a marijuana grow operation. Based on this e-mail, Detective Scott Patrick of the Quad Cities Drug Task Force began an investigation into Markwart and Allele Seeds Research. In describing why he initiated the investigation, Detective Patrick explained:

> People who are involved in narcotic trafficking become targets for people because if you rob somebody who's involved in narcotic trafficking, oftentimes they don't report to the police. I know of at least three instances in the City of Pullman in the last year in which we've had people who have been robbed at either gunpoint or knifepoint, specifically one in particular who was allegedly selling marijuana.
> So, the firearm issue was a little bit—what I was concerned about because of the proximity. Campus Commons North is about a 300-unit apartment complex in the city. It's a courtyard situation, there's multiple apartments in the area, and my concern was a run-and-gun battle through the middle of that if someone was to break into his [Markwart's] apartment.

Report of Proceedings (RP) at 128.

3

Tyler Markwart is an outspoken advocate for medical marijuana. During his investigation, Detective Scott Patrick located statements Markwart made to the Washington State University (WSU) *Daily Evergreen* and *Moscow-Pullman Daily News* that led him to believe Markwart violated MUMA. Specifically, Markwart disclosed to the press that he provided marijuana to more than one qualifying patient. MUMA permits a person to be a "designated provider to only one patient at any one time." Former RCW 69.51A.010(1)(d) (LAWS OF 2007, ch. 371, § 5).

Based on Tyler Markwart's public statements, Detective Patrick decided to seek a "controlled buy" from Markwart. At a Whitman County deputy prosecutor's request, Patrick postponed the purchase until the Whitman County prosecuting attorney and he could meet with Markwart. The prosecutor's office wished to inquire from Markwart about his operations and determine if he complied with MUMA.

The Whitman County prosecutor and his deputy met with Tyler Markwart and informed Markwart that he was in violation of MUMA if he provided marijuana to more than one person at a time. Markwart assured them he did not. He claimed to provide marijuana to one qualified patient at a time for a limited period of time. Perhaps unsatisfied with Markwart's answer, the county prosecutor directed Detective Patrick to continue his investigation.

4

Detective Scott Patrick conducted three controlled buys from Tyler Markwart. A WSU student whom police previously arrested for marijuana distribution became a confidential informant and conducted the first controlled buy in exchange for a reduced sentence. The police gave the informant the website address for Allele Seeds Research and directed the informant to contact Markwart. Markwart instructed potential purchasers, via his website, that they must present valid authorization as a qualified patient under MUMA and Washington State identification. The website also listed an e-mail address belonging to Markwart.

The confidential informant sent a message to Tyler Markwart using the e-mail address found on the Allele Seeds website. The informant stated that he recently obtained authorization for medical marijuana and wanted to purchase marijuana. In his response, Markwart sent the informant his phone number and again warned him that he must present a valid medical marijuana authorization form and identification card. When the confidential informant called Markwart to arrange a meeting to purchase marijuana, the two agreed to meet at the restaurant Cougar Country. Markwart again repeated his warning that he would need to see paperwork and identification to make a delivery.

Before the transactional meeting between the confidential informant and Tyler Markwart, Detective Scott Patrick completed an ersatz medical marijuana authorization form for the confidential informant and curiously directed another detective, with better handwriting, to sign the form using the name of a fictionalized doctor. The physician's

5

authorization was written on non-tamper resistant paper, despite RCW 69.51A.010(7)(a) requiring authorizations on tamper resistant paper.

On March 10, 2011, the confidential informant joined Tyler Markwart at a table at Cougar Country restaurant. Markwart asked to see his authorization for medical marijuana. The informant presented the authorization police created, showed Markwart his identification card, and signed a form designating Markwart as his provider of medical marijuana. Markwart told the informant that he would not need to see the written forms in the future. Markwart and the informant left Cougar Country for Markwart's truck where the informant purchased $200 worth of marijuana.

On March 24, 2011, the police informant contacted Tyler Markwart to purchase marijuana again. The two met at Jimmy John's, a sandwich shop. Markwart did not ask to see the informant's authorization or identification. Outside the restaurant, Markwart again sold the informant $200 worth of marijuana.

On April 5, Detective Scott Patrick created a fake e-mail account for Police Detective Bryson Aase, who sent an e-mail to Allele Seeds Research claiming to be a "patient living in the Pullman area looking to purchase medicine." CP at 140. In the e-mail, Aase also claimed to have his "paperwork." CP at 141. Markwart responded, asking Aase to contact him by cell phone. Detective Patrick completed a medical authorization form for Bryson Aase and signed the form in the name of a fictitious

6

doctor. Detective Patrick did not print the medical authorization on tamper resistant paper.

The confidential informant purchased marijuana from Tyler Markwart a third time outside a Starbucks on April 15. Markwart exited Starbucks as the informant arrived. The police informant waived Markwart towards his or her vehicle and asked to purchase $200 worth of marijuana. Markwart only brought $140 worth of marijuana to sell. Markwart informed the informant that the informant could purchase more at a party that evening and advised the informant he could "smell him at the party." RP at 60.

On April 19, police conducted a fourth controlled buy, this time with Detective Aase. Bryson Aase called Markwart to schedule a meeting where he could purchase marijuana. Markwart told Aase he would need a medicinal marijuana authorization form and a government issued photo identification. The two agreed to meet in a parking lot. Before the meeting, Detective Patrick directed Aase to feign that he had forgotten his driver's license and to see how Markwart would react. Detective Patrick then handed Aase a falsified authorization form. The form was identical, except for the name of the doctor, as the form Patrick provided the confidential informant.

Detective Aase met Tyler Markwart in the parking lot. From a nearby location, Scott Patrick listened to the conversation between Markwart and Aase, while task force members awaited directions to arrest Markwart. Markwart entered Aase's car and handed Aase a designated provider form to complete and sign. Markwart then asked

7

Aase for his identification and medical marijuana authorization. Aase handed Markwart his forged medical marijuana authorization form and explained that he did not have identification. Markwart commented that the authorization was not on tamper resistant paper and explained that he could not sell Aase marijuana without a valid driver's license. Due to Markwart's refusal to sell, Detective Patrick directed the task force members to arrest Markwart. Police arrested Markwart for attempted delivery and delivery of a controlled substance.

Upon his arrest, Tyler Markwart notified police he had marijuana plants in his home. Based on this information, police procured a search warrant for Markwart's apartment. At the home, police found a business plan for Allele Seeds Research, 24 marijuana plants, forms designating Markwart as the provider of marijuana to 15 individuals, a shotgun, and a handgun.

## PROCEDURE

The State charged Tyler Markwart with three counts of delivering marijuana, one each respectively on March 10, March 24, and April 15, 2011, all to the confidential informant. The State also charged Markwart with one count of possessing marijuana with the intent to distribute on April 19, 2011, to the undercover officer, and one count of manufacturing marijuana, based upon the search of Markwart's home on April 19. Throughout the prosecution, Markwart represented himself, despite the trial court's repeated cautions.

8

Before trial, Tyler Markwart asked the trial court to strike down the Uniform Controlled Substances Act (CSA), chapter 69.50 RCW. After losing this request, Markwart asked the trial court to permit him to present an affirmative "designated provider" defense under MUMA and to forward an entrapment defense. Conversely, the State asked the trial court to dismiss the defenses, as a matter of law, based upon the undisputed evidence. The State contended Markwart did not comply with MUMA because he served more than one patient at a time, he had more plants than permitted, he accepted authorizations for using medicinal marijuana signed by a fictional doctor, and the authorizations were not on tamper resistant paper.

The trial court preliminarily ruled that, if Markwart presented sufficient evidence at trial, the trial court would instruct the jury on Markwart's theory of entrapment. The trial court, however, ruled, at the beginning of the trial, to preclude a MUMA defense to any of the five charges, because Markwart's offer of proof was insufficient to support the defense. As to the delivery to the confidential informant, the trial court observed that undisputed evidence established that the confidential informant was not a qualifying patient and the medical authorization was forged and not on tamper resistant paper. Therefore, Tyler Markwart could not be a designated provider, as a matter of law, under MUMA. The trial court based his decision with regard to possession with intent to deliver to Detective Aase upon the same three grounds and the additional ground that Aase showed no identification. Although Markwart did not sell to Aase, it was

undisputed he had the marijuana in his possession and he intended to deliver the marijuana, despite Aase not being a qualifying person. The trial court dismissed the affirmative defense on count 5—manufacturing, because at the time of the offense, Markwart possessed 15 designated provider authorization forms. The trial court qualified his ruling by stating, if Markwart could provide evidence that he was a provider for only one person on April 19, the court would reconsider the defense going to the jury on the manufacturing charge.

At trial, the State produced four witnesses: the confidential informant; Detectives Patrick and Aase; and Nannette Bolyard, a certified marijuana technician. They testified to the controlled buys. Markwart presented no witness or defense.

A jury found Tyler Markwart guilty on all five counts. After the verdict but before sentencing, Markwart hired counsel and moved for a new trial. He argued prosecutorial misconduct. He also argued the trial court erred by prohibiting him from presenting his "designated provider" defense and refusing to instruct the jury on entrapment. The trial court denied his motion, finding Markwart failed to raise the issue of prosecutorial misconduct at trial, that police were permitted to forge documents under the circumstances, and that he failed to present sufficient evidence entitling him to argue his designated provider defense at trial.

10

The trial court sentenced Tyler Markwart to serve, concurrently, the low end of the standard range on all five convictions—six months. In addition, the court imposed a $10,000 fine as a deterrent to exploit MUMA for personal financial gain.

LAW AND ANALYSIS

Government Misconduct

Tyler Markwart contends that the government engaged in misconduct that violated his due process rights. Markwart emphasizes his actions in complying with the law by avoiding a sale to the undercover detective and the police falsifying and forging documents. If we agreed with Markwart, we must dismiss the prosecution and all other issues would become moot. Thus, we address this issue first. We acknowledge Tyler Markwart's wish to follow the law and his steps taken to comply with the law, but we agree with the trial court that police conduct was not so outrageous as to violate Markwart's constitutional rights. The defense of government misconduct is nearly impossible to establish.

CrR 8.3(b) reads, in relevant part:

> The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial.

This rule codifies, in part, the due process requirement that a prosecution be dismissed upon outrageous conduct of law enforcement. Unlike entrapment, where the

11

focal issue is the predisposition of the defendant to commit the offense, outrageous conduct is focused on the State's behavior. *State v. Lively*, 130 Wn.2d 1, 19, 921 P.2d 1035 (1996). Outrageous conduct is founded on the principle that the conduct of law enforcement officers and informants may be so outrageous that due process principles would bar the government from invoking judicial processes to obtain a conviction. *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973); *Lively*, 130 Wn.2d at 19. But such conduct must be so outrageous that it violates the concept of fundamental fairness inherent in due process and shocks the sense of universal justice mandated by the due process clause. *Dodge City Saloon, Inc. v. Wash. State Liquor Control Bd.*, 168 Wn. App. 388, 402, 288 P.3d 343, *review denied*, 176 Wn.2d 1009 (2012); *State v. Rundquist*, 79 Wn. App. 786, 794, 905 P.2d 922 (1995); *State v. Pleasant*, 38 Wn. App. 78, 82, 684 P.2d 761 (1984).

The doctrine of outrageous police conduct must be sparingly applied and used only in the most egregious situations. *Rundquist*, 79 Wn. App. at 793. Each case must be resolved on its own unique facts, bearing in mind proper law enforcement objectives— the prevention of crime and the apprehension of violators, rather than the encouragement of and participation in sheer lawlessness. *Lively*, 130 Wn.2d at 21 (quoting *People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78, 83 (1978)). Whether the State has engaged in outrageous conduct is a matter of law, not a question for the jury.

12

No. 31158-9-III
*State v. Markwart*

*Lively*, 130 Wn.2d at 19 (citing *United States v. Dudden*, 65 F.3d 1461, 1466-67 (9th Cir. 1995)).

Practical considerations require that, in the performance by police of crime detection duties, at least some deceitful practices and a limited participation in unlawful practices be tolerated and recognized as lawful. *Lively*, 130 Wn.2d at 20; *State v. Emerson*, 10 Wn. App. 235, 240-41, 517 P.2d 245 (1973). The United States Supreme Court has stated that it is unlikely a due process violation will ever be found in the context of contraband offenses, since the detection of such offenses requires law enforcement officials to resort to covert methods which would be unacceptable in other contexts. *Hampton v. United States*, 425 U.S. 484, 493-95, 96 S. Ct. 1646, 48 L. Ed. 2d 113 (1976); *Emerson*, 10 Wn. App. at 238. In crimes such as prostitution, liquor sales, narcotics sales, and gambling, the use of the paid informer, undercover agents, and deceitful practices, as well as the practice of actually aiding and abetting the commission of a crime by others, or even joining in a conspiracy for that commission, are well known. *Emerson*, 10 Wn. App. at 238.

Deceitful police misconduct does not warrant dismissal of an entire case. *State v. Athan*, 160 Wn.2d 354, 377, 158 P.3d 27 (2007); *State v. Myers*, 102 Wn.2d 548, 689 P.2d 38 (1984), *overruled on other grounds by Lively*, 130 Wn.2d 1. Mere instigation of crime is not outrageous in the context of detecting contraband offenses. *Pleasant*, 38 Wn. App. at 82-83. Washington courts reject the outrageous conduct defense even in

13

cases where police engage in illegal activities. *State v. Jessup*, 31 Wn. App. 304, 312-14, 641 P.2d 1185 (1982). For example, police agents may engage in acts of prostitution and attempt to recruit new prostitutes. *Jessup*, 31 Wn. App. at 312-14. Police may purchase lewd table dances with public funds to gain evidence of violation of liquor rules. *Playhouse Corp. v. Wash. State Liquor Control Bd.*, 35 Wn. App. 539, 667 P.2d 1136 (1983). Police may establish an elaborate operation for the purchase and sale of stolen goods. *State v. Brooks*, 30 Wn. App. 280, 281-82, 286-87, 633 P.2d 1345 (1981). Law enforcement may create a phony job recruiting center and solicit the purchase of marijuana from a potential job applicant. *Pleasant*, 38 Wn. App. at 79-80, 83. A federal appellate court refused to dismiss a prosecution when federal agents sold illegally imported bobcat hides and provided false forms intended to show that the hides were legal. *United States v. Ivey*, 949 F.2d 759, 762-63, 769 (5th Cir. 1991).

A review of many decisions shows that "the banner of outrageous misconduct is often raised but seldom saluted." *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993). A majority of the United States Supreme Court has never approved of the outrageous conduct defense. We find only one Washington decision that has dismissed a prosecution for outrageous conduct by government agents. *Lively*, 130 Wn.2d at 19.

In *Lively*, the court found the police conduct so outrageous it violated Lively's due process rights. Lively had just turned 21 and was raising 2 small children alone. She became addicted to cocaine and alcohol at age 14. Although she stopped using drugs at

14

when she found she was pregnant, she continued to drink heavily. After attempting alcohol withdrawal on her own, she admitted herself into a detoxification program and followed with attendance at Alcoholics Anonymous (AA) meetings. She relapsed, however, and thereafter entered and successfully completed a 28-day inpatient program. She continued with AA meetings. She was emotionally upset, however, and attempted suicide. Within weeks of her suicide attempt she met the police informant, Desai, at an AA meeting. Despite her lack of criminal history or any information connecting her to criminal conduct, the police informant targeted Lively. A few weeks later she was living with Desai and he proposed marriage to her. Desai took advantage of her addiction and extreme emotional reliance to involve her in police sponsored drug activity.

The *Lively* court announced that, to aid courts in the evaluation of government misconduct, a court should review several factors:

> [(1)] whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity; [(2)] whether the defendant's reluctance to commit a crime was overcome by . . . persistent solicitation; [(3)] whether the government controls the criminal activity or simply allows for the criminal activity to occur; [(4)] whether the police motive was to prevent crime or protect the public; [(5)] whether the government conduct itself amounted to criminal activity or conduct "repugnant to a sense of justice."

*Lively*, 130 Wn.2d at 22 (citations omitted).

Since *Lively*, no Washington State court has dismissed a defendant's charges or overturned a conviction because of outrageous government conduct—but not for lack of the defense bar trying. At least 18 defendants sought to have their convictions overturned

because of outrageous government conduct. Only 2 of those cases have been reported, and neither is dispositive.

Law enforcement did not induce Tyler Markwart to engage in any conduct he was not already willing to perform. Markwart grew and sold marijuana before any interaction with the Pullman Police Department. Police did not engage in persistent solicitations before Markwart reluctantly sold marijuana. Nor did police promise profits or plead for sympathy. Markwart was not emotionally attached to an officer or informant. Law enforcement believed Markwart violated MUMA by selling to more than one patient at a time, a reasonable belief before our *Shupe* decision. Police did not initially look for Tyler Markwart, but rather Markwart came to the Pullman Police Department's attention when investigating a robbery. The prosecuting attorney's office did not hide its intentions from Markwart, but rather warned him that it was its position that Markwart could not be the provider of medical marijuana to more than one patient at the same time. This case's circumstances do not support a violation of the due process clause because of government misconduct.

## MEDICAL USE OF MARIJUANA ACT

### Retroactive Application of 2011 Amendments

In 1998, the citizens of Washington enacted Initiative 692, the Medical Use of Marijuana Act (MUMA). The act is codified in chapter 69.51A RCW. The purpose of the act is to allow patients with terminal or debilitating illnesses to use marijuana when

16

authorized by their treating physician. RCW 69.51A.005; *State v. Ginn*, 128 Wn. App. 872, 877-78, 117 P.3d 1155 (2005). In 2011, the state legislature adopted substantial amendments to MUMA, now called Medical Use of Cannabis Act (MUCA). ENGROSSED SECOND SUBSTITUTE S.B. 5073, 62d Leg., Reg. Sess. (Wash. 2011) (ESSSB). The bill's effective date is July 22, 2011. Section 403 of the 2011 bill allows creation of collective marijuana gardens by medical users of the plant. Markwart seeks to benefit from this provision.

Police arrested Tyler Markwart, on April 19, 2011, for manufacturing, distributing, and possession with intent to sell marijuana. Therefore, he asks this court to retroactively apply the legislature's 2011 changes. We decline to do so.

Washington courts disfavor retroactive application of a statute. *State v. Brown*, 166 Wn. App. 99, 103, 269 P.3d 359 (2012). Nevertheless, courts may apply an amendment retroactively if (1) the legislature intended to apply the amendment retroactively, (2) the amendment is curative and clarifies or technically corrects ambiguous statutory language, or (3) the amendment is remedial in nature. *Barstad v. Stewart Title Guar. Co.*, 145 Wn.2d 528, 536-37, 39 P.2d 984 (2002); *McGee Guest Home, Inc. v. Dep't of Soc. & Health Servs.*, 142 Wn.2d 316, 324-25, 12 P.3d 144 (2000).

Tyler Markwart meets none of the three criteria. The legislature was silent on whether it intended to apply the 2011 amending statute retroactively. An amendment is

17

curative and remedial if it clarifies or technically corrects an ambiguous statute without changing prior case law constructions of the statute. *Barstad*, 145 Wn.2d at 537; *In re Pers. Restraint of Matteson*, 142 Wn.2d 298, 308, 12 P.3d 585 (2000). The 2011 amended statute changes, as well as clarifies, former RCW 69.51A.040. The amendments add new requirements. The collective gardens provision of ESSSB 5073 adds an additional way qualified patients can obtain marijuana—through cooperative gardens. Markwart agrees the section decriminalizes what otherwise would be criminal, a concession acknowledging the 2011 amendments are substantive. Thus, we conclude that the 2011 amendments do not apply retroactively.

The 2011 amendments would not assist Tyler Markwart anyway. The collective garden provision states "no more than ten qualifying patients may participate in a single collective garden at any time." RCW 69.51A.085(1)(a). Markwart was a designated provider for 15 people. We decide the appeal on the basis of the version of the MUMA in effect after its 2007 amendments, but before the 2011 amendments.

## MUMA AFFIRMATIVE DEFENSE

MUMA provides an affirmative defense for patients and providers against Washington criminal laws relating to marijuana. *State v. Shepherd*, 110 Wn. App. 544, 549, 41 P.3d 1235 (2002). "Any qualifying patient who is engaged in the medical use of marijuana, or any designated provider who assists a qualifying patient in the medical use of marijuana" charged with violating state marijuana law "will be deemed to have

18

established the affirmative defense to such charges by proof of his or her compliance with the requirements provided in this chapter." Former RCW 69.51A.040 (LAWS OF 2007, ch. 371, § 5). The chapter requires a qualifying patient or designated provider to (1) meet all criteria for status as a qualifying patient or designated provider; (2) possess no more marijuana than is necessary for the patient's personal medical use, not exceeding a 60-day supply; and (3) present his or her valid documentation to any law enforcement official who questions the patient or provider. Former RCW 69.51A.040 (LAWS OF 2007, ch. 371, § 5).

To be a "qualifying patient" under MUMA, a person must be a resident of Washington with a debilitating or terminal medical condition and advised by a physician that they may benefit from the medical use of marijuana. Former RCW 69.51A.010(3) (LAWS OF 2007, ch. 371, § 5). To be a "designated provider" under the chapter, a person must be over 18, designated in writing by a qualified patient to be that patient's provider, and be "the designated provider to only one patient at any one time." Former RCW 69.51A.010(1)(d) (LAWS OF 2007, ch. 371, § 5). Whether the person is a patient or a designated provider, she or he, if questioned by any law enforcement official about her or his use, must present her or his "valid documentation," specifically (1) a statement signed and dated by the qualifying patient's health care professional written on "tamper-resistant paper," stating that in the professional's opinion, the patient may benefit from the

19

medical use of marijuana and (2) proof of identity such as a Washington state driver's license. Former RCW 69.51A.010(5) (LAWS OF 2007, ch. 371, § 5).

In order to affirmatively defend a criminal prosecution for possessing or manufacturing marijuana, a defendant must show by a preponderance of evidence that he has met the requirements of MUMA. *Shepherd*, 110 Wn. App. at 550; *Ginn*, 128 Wn. App. at 878. An affirmative defense that does not negate an element of the crime, but excuses the conduct, must be proved by a preponderance of the evidence. *State v. Riker*, 123 Wn.2d 351, 368, 869 P.2d 43 (1994). Preponderance of the evidence means that considering all the evidence, the proposition asserted must be more probably true than not true. *Shepherd*, 110 Wn. App. at 550; *Ginn*, 128 Wn. App. at 878.

Tyler Markwart contends the trial court erred when it refused to allow the jury to consider his MUMA designated provider defense. Whether the trial court erred in disallowing a medical marijuana defense is a legal question this court reviews de novo. *State v. Fry*, 168 Wn.2d 1, 10-11, 228 P.3d 1 (2010); *State v. Tracy*, 158 Wn.2d 683, 687, 147 P.3d 559 (2006). In general, a trial court must permit a party to present his theory of the case if the law and the evidence support it; the failure to do so is reversible error. *Ginn*, 128 Wn. App. at 879; *State v. May*, 100 Wn. App. 478, 482, 997 P.2d 956 (2000). A defendant is entitled to have a jury consider his defense if he presents sufficient evidence. *Ginn*, 128 Wn. App. at 879; *State v. Janes*, 121 Wn.2d 220, 236-37, 850 P.2d 495 (1993). To raise a medical marijuana defense, the defendant bears the burden of

20

offering sufficient evidence to make a prima facie showing. *Fry*, 168 Wn.2d at 11; *State v. Adams*, 148 Wn. App. 231, 236, 198 P.3d 1057 (2009); *State v. Butler*, 126 Wn. App. 741, 744, 109 P.3d 493 (2005) *overruled on other grounds by State v. Kurtz*, 178 Wn.2d 466, 475, 309 P.3d 472 (2013). In evaluating whether the evidence is sufficient, the trial court must interpret the evidence most strongly in favor of the defendant. *Adams*, 148 Wn. App. at 235; *Ginn*, 128 Wn. App. at 879.

The State charged Tyler Markwart with three discrete crimes: delivery of marijuana (counts 1 to 3), possession with intent to deliver marijuana (count 4), and manufacturing marijuana (count 5). We address separately Markwart's quest to use the MUMA defense for the three different crimes. We address manufacturing first, since its resolution is easiest.

## MANUFACTURING MARIJUANA

RCW 69.50.401(1) renders it is "unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance." The trial court dismissed the MUMA defense against the manufacturing charge because Markwart possessed 15 provider designation forms at one time, and the statute only allows one to be a provider "to only one patient at any one time." Former RCW 69.51A.010(1)(d).

After the trial court's ruling, our division interpreted the provision at issue in *Shupe*, 172 Wn. App. at 354-55. Scott Shupe and others owned and operated a Spokane medical marijuana dispensary that advertised in local papers. During one stop by Oregon

21

police, Shupe possessed four pounds of marijuana and $18,900 in cash. Police trailed Shupe for months despite Shupe conducting business in the open. The State eventually charged Shupe with delivery, possession with intent to deliver, and manufacture of marijuana. At trial, Shupe testified he served only one patient at a time and sold only to patients with medical marijuana documentation. Shupe's receipts showed the time to the minute as to when he served each patient.

The *Shupe* court noted that the term "designated provider" implies an ongoing relationship with a user, but found the word "at" gives a sense of "immediacy." *Shupe*, 172 Wn. App. at 354. The phrase "provider to only one patient at any one time," this court concluded, "is at war with itself; it is ambiguous." *Shupe*, 172 Wn. App. at 354. Because the statute is ambiguous, the rule of lenity required the court to interpret the ambiguous statute in favor of the defendant. Thus, the *Shupe* court accepted the interpretation Shupe urged and held that "'only one patient at any one time' means one transaction after another so that each patient gets individual care." *Shupe*, 172 Wn. App. at 356. The *Shupe* court reversed the conviction and dismissed the prosecution.

Tyler Markwart contends *Shupe* controls and requires that he be afforded the opportunity to present his MUMA defense. The State distinguishes *Shupe* on the ground that Shupe testified he served only one patient at a time, and the receipts showed the time to the minute as to when he served each patient. *Shupe*, 172 Wn. App. at 356. We agree

22

with Tyler Markwart. The State's distinction is irrelevant for purposes of the rule announced in *Shupe*.

The State emphasizes that law enforcement found 15 provider forms in Markwart's possession and nearly all of the patients served by Markwart signed the designation on one of two days. The State is incorrect; the forms show 15 people designated Markwart as their respective provider on seven dates. No more than 3 people on any given day designated Markwart as their provider on six of those dates. Regardless of when a patient signed a designated provider form, construing the facts in the light most favorable to Markwart, he could have served those patients at different times during the day. Whether he did is a question for the jury.

The State also underscores that some of the forms designating Markwart as a provider lacked expiration dates. Nevertheless, the statute does not require forms designating a provider to have expiration dates. Former RCW 69.51A.090.

Finally, the State contends that Scott Shupe's authorization from a patient, unlike Tyler Markwart's authorization, ended upon the sale. Along these lines, the State argues that a provider cannot grow marijuana for more than one person at a time. We find no language in *Shupe* stating that Shupe's authorization form only consented to one sale. Regardless, the statute does not require that the authorization end with one sale. Nor does the statute limit the provider to growing for one patient at a time. The State's argument conflicts with the language and spirit of *Shupe*. If one can be the provider for

23

more than one patient at one time, although one must conduct sales at different times, one must be able to grow marijuana for more than one patient at a time.

The only other elements required under MUMA to be a "designated provider" are (1) the provider is over 18 and (2) designated in writing to be the qualifying patient's provider. Former RCW 69.51A.010(1)(a), (b). Markwart's license, photocopied with the designated provider forms, shows he was born in 1981, making him 30 at the time of his offense. Those same forms designate him as a provider to qualifying patients and thereby satisfy the remaining element.

Given the ambiguous statute, the patient trial court understandably erred. But under this court's interpretation of the statute in *Shupe*, Markwart was entitled to present his affirmative medical marijuana defense against the charge of manufacturing marijuana.

## DELIVERY OF MARIJUANA

Whether Tyler Markwart, under the undisputed facts, could proceed with a MUMA defense for the charges of delivery and possession with intent to sell is more problematic. At trial, the State contended that Markwart could not proceed with his defense to the possession and delivery counts since the police doctored the doctor's authorization form for the confidential informant and Detective Aase; since both forms were non-tamper resistant; and since Aase lacked identification, in addition to the high number of patients served. During oral argument on appeal, the State conceded that Markwart need not have investigated whether the physician's authorization forms were

24

forged. The State continues to argue that Markwart should have known that the forms were non-tamper resistant, and thus he does not qualify as a provider under MUMA.

The delivery charges relate to the sales to the confidential informant. Markwart does not dispute that the authorization the informant showed was not on tamper resistant paper. To establish the affirmative defense, a person must meet the criteria for status as a designated provider and present his "valid documentation" to any law enforcement official who questions him. Former RCW 69.51A.040 (LAWS OF 2007, ch. 371, § 5). Valid documentation required a statement signed by a health care professional "on tamper-resistant paper." Former RCW 69.51A.010(7)(a).

Tyler Markwart argues the trial court should have permitted him the opportunity to argue to the jury that providers may reasonably rely on documentation presented by a patient. We find no case that implies the medical marijuana provider may rely on the patient to present the obligatory documentation. We find no case that waives the requirement that a medical marijuana provider insure that the authorization be on special paper. Further, Markwart's argument conflicts with the statute. MUMA expresses an intent that the provider ascertain the qualifications of the patient. The citizens of Washington, when adopting MUMA, and the state legislature, when enacting amendments, necessarily considered tamper resistant paper critical in the delivery of medical marijuana. The citizens and legislators understood the ease by which authorizations could otherwise be forged. If Tyler Markwart did not know what

25

constituted tamper resistant paper or was unable to detect the special form of paper, he should not have been in the business of selling medical marijuana. He should have educated himself, before making any sales. Markwart's dealings with Detective Aase also belie his claim that either he was unable to detect tamper resistant paper or he should not be required to detect the nature of the paper.

## POSSESSION WITH INTENT TO SELL

We finally address whether Tyler Markwart may present the MUMA defense to the charges of possession with intent to sell. The trial court dismissed the defense to this charge because Markwart had intended to sell to Detective Aase when Markwart was not a qualified provider. We have already ruled that Markwart can present the defense that he was a qualified provider, despite being designated as a provider by more than one person. Critical to the count of possession are the facts that the State concedes Markwart refused to sell to Aase because his authorization was not on tamper resistant paper and Aase lacked identification. Tyler Markwart acted consistent with the law. Unlike his failure to carefully observe the confidential informant's documentation, Markwart took the precautions when meeting with Detective Aase. The MUMA defense is available to Tyler Markwart on the charge of possession with intent to deliver.

## SENTENCING

Tyler Markwart also complains about the sentence imposed by the trial court. We are remanding the case for a new trial on the charges of manufacturing and possession

26

with intent to deliver a controlled substance. Therefore, we vacate the trial court's sentence and direct the trial court to enter a new sentence after any new trial. Therefore, we need not consider any sentencing errors at this time.

## CONCLUSION

We affirm the convictions of Tyler Markwart for three counts of delivery of marijuana to the confidential informant. We vacate the convictions for manufacturing and possession with intent to sell and remand those charges for a new trial during which Tyler Markwart may present his MUMA defense. We also vacate the sentence imposed by the trial court. The court shall resentence Tyler Markwart after completion of a new trial or a dismissal of the remaining charges.

_____
Fearing, J.

WE CONCUR:

_____          _____
Brown, J.                                                  Siddoway, C.J.

27